947 P.2d 961

**Janie DITTO, Plaintiff–Appellee,**

v.

**John A. McCURDY, Jr., M.D.,
Defendant–Appellant,**

and

**Karla Scarpiova, Defendant.**

No. 17346.

Intermediate Court of Appeals of Hawai'i.

June 9, 1997.

As Amended June 20, 1997.

Peter Van Name Esser, Honolulu, on the brief for defendant-appellant.

David C. Schutter (Schutter & Associates, of counsel) Honolulu, on the brief for plaintiff-appellee.

Robert A. Smith (Robert A. Smith, Attorney at Law, A Law Corporation, Kaneohe, of counsel) on the amicus curiae brief for The American Board of Cosmetic Surgery, Inc. and The American Academy of Cosmetic Surgery.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

KIRIMITSU, Judge.

In this medical malpractice case, defendant-appellant Dr. John A. McCurdy, Jr. (Dr. McCurdy) appeals from the First Circuit Court's initial judgment, dated July 7, 1992; the order denying Dr. McCurdy's motion for judgment notwithstanding the verdict (JNOV) dated July 20, 1992; the order granting in part plaintiff-appellee Janie Ditto's (Ditto) motion for prejudgment interest dated September 1, 1992; the order denying Dr. McCurdy's motion for reconsideration of the supplemental judgment for prejudgment interest dated August 3, 1993; the supplemental judgment for prejudgment interest and costs dated September 17, 1992; the order vacating the judgment in favor of Karla Scarpiova (Scarpiova) and confirming the judgment in favor of Dr. McCurdy dated November 6, 1992; and the August 9, 1993 amended judgment awarding compensatory and punitive damages to Ditto.[1] We reverse that portion of the trial court's August 9, 1993 amended judgment that awarded prejudgment interest on punitive damages, vacate that portion that awarded fraud damages, vacate the remaining award of prejudgment interest, and remand for further proceedings consistent with this opinion. In all other respects, we affirm.

## I. BACKGROUND

### A. Summary Of The Facts

Ditto is a first generation Korean immigrant. She migrated to the United States in 1976 after marrying an American serviceman and settled in Hawai'i ten years later. Ditto suffered from a history of serious illnesses throughout her life, including childhood polio and recent problems with high blood pressure, diabetes, heart complications, and hyperthyroidism. The drug treatment for her hyperthyroidism ultimately caused her breasts to flatten.

Ditto's breast disfigurement prompted her to consider breast augmentation surgery. She subsequently visited Dr. McCurdy for a consultation on October 23, 1986. Dr. McCurdy is a board-certified otolaryngologist (generally referred to as an ear, nose, and throat specialist) with practices on Maui and in Honolulu. Dr. McCurdy is also certified by the American College of Surgeons

---

1. The jury awarded Janie Ditto $3,500 in special damages and $1,000,000 in general damages for negligence, $400,000 in damages for fraud, and $600,000 in punitive damages. Additionally, the trial judge awarded Janie Ditto (Ditto) $743,-381.92 in prejudgment interest on September 9, 1992, and $42,106.39 in costs on September 17, 1992.

and the American Board of Cosmetic Surgeons (ABCS). The ABCS is not recognized by the American Board of Medical Specialties, which accredits and supervises specialty practices.[2] Dr. McCurdy began performing breast augmentation surgery in 1982, had performed over 150 such surgeries by 1986, gave lectures, and has published books and articles on cosmetic surgery, including breast augmentation surgery.

Ditto testified that during her consultation, Dr. McCurdy conducted a five minute physical exam and took her medical history. She testified that the medical history portion of the consultation essentially consisted of a single question, specifically, whether she was presently taking any medication. Dr. McCurdy neither asked, nor did Ditto volunteer, any information about Ditto's prior illnesses.[3] Moreover, Ditto alleges that Dr. McCurdy did not discuss any potential complications. According to Ditto, the entire consultation lasted approximately twenty minutes.

On the other hand, Dr. McCurdy testified that he discussed with Ditto the possibility that bleeding, infection, nerve damage, and hardening of the breasts could result from the surgery. His medical notes indicate that Ditto "has no history of breast masses, or other disorders and no family history of breast cancer. No bleeding disorders, aspirin or other medication that she took [sic] which would be predisposed to bleeding [sic] no known allergies." In addition, he testified

that he explains to all of his patients that they have to make four decisions: type of implant, incision location, implant location, and size of implant.

At the conclusion of the consultation, Dr. McCurdy recommended a mammary augmentation by inserting silicone implants through sub-glandular incisions in the nipples. Ditto agreed. Although Ditto inquired about an under-breast incision, Dr. McCurdy explained that he did not use the procedure due to adverse consequences. In addition, Ditto testified that Dr. McCurdy did not explain any alternative forms of breast augmentation procedures, including those with potentially fewer complications.

On November 3, 1986, Ditto arrived at Dr. McCurdy's Honolulu office to undergo the breast augmentation surgery. Ditto, who testified that she has a fourth grade education, was given a consent form to "read" and sign before undergoing the procedure. Ditto, however, could not understand written English, and thus asked Dr. McCurdy what the form contained. Ditto testified that Dr. McCurdy told her the form merely gave him permission to conduct the operation.

In reality, the consent form gives a very detailed description of potential complications, including "severe loss of blood, infection, cardiac arrest and other consequences that can lead to death or permanent or partial disability, which can result from any procedure."[4] Additionally, the form states that the "physician has informed [the patient]

2. Apparently, board certification distinguishes cosmetic surgeons from plastic surgeons. Plastic surgeons are certified by the American Board of Plastic and Reconstructive Surgery, which is recognized by the American Board of Medical Specialties. Although board certification by the American Board of Cosmetic Surgeons (ABCS) qualifies physicians in any specialty to perform breast augmentation surgery, it does not allow them to carry the title of plastic surgeon. Dr. Jonathan Won, Executive Director of the Hawai'i Medical Association, testified at trial that doctors are licensed in Hawai'i without regard to any specialty area and can choose the specialty or specialties they wish to practice in. He acknowledged that there was a nationwide "turf battle" being waged between plastic surgeons and cosmetic surgeons.

3. Defendant-appellant Dr. John A. McCurdy, Jr. (Dr. McCurdy) acknowledged during his cross-

examination testimony that diabetes and hyperthyroidism can complicate breast augmentation procedures, in some cases disrupting the recovery process:

[Ditto's Counsel] Diabetes is an important thing to know, because it can retard healing of the breast, correct.
. . . .
[Dr. McCurdy] In some cases of advanced juvenile diabetes, it can, but it can or sometimes it doesn't.
[Ditto's Counsel] Retard healing, that is another complication, another problem with diabetes, any type of illness or surgery that you have, it can retard healing, correct?
[Dr. McCurdy] Certain types of diabetes in certain situations can, yes.

4. Other possible complications, as the experience of Ditto shows, include scarring, hardening of the breasts, and deformity.

of the ... risks or complications involved in [the] treatment or procedures ... and alternative forms of treatment, including non-treatment, available." Despite the explicit language of the consent form, Ditto testified that she was unable to understand any of the warnings or explanations. Nevertheless, Dr. McCurdy believed that Ditto could speak English well enough to read and comprehend the consent form's contents. But he did not ask Ditto whether she could actually read or understand the consent form.

After signing the consent form, Ditto was placed under general anesthesia and underwent the first of what would ultimately be seven surgical procedures. During the first procedure, Dr. McCurdy inserted the silicone implants. Shortly after regaining consciousness, Ditto experienced severe pain in her right breast. Dr. McCurdy diagnosed the pain as a hematoma (internal bleeding)[5] and immediately placed Ditto under general anesthesia again to surgically repair the hematoma.

While recovering from the second surgery, Dr. McCurdy examined Ditto, determined that the bleeding was under control, and told her she could go home. She testified that she asked to stay in the recovery room a "little while longer," but Dr. McCurdy refused, explaining that he had a number of patients who needed to use the recovery room. Although the precise manner of her discharge was disputed by Dr. McCurdy during his testimony, Ditto was subsequently sent home with antibiotics and painkillers.

Later in the afternoon, Ditto had recurring pain in both breasts. She then returned to Dr. McCurdy's office for her third surgery of the day. After awakening from general anesthesia, Ditto immediately went home.

Over the course of the next ten days, from approximately the 4th through the 14th of November, Ditto visited Dr. McCurdy's office numerous times for follow-up appointments.

During this period, the incision on her right breast was not healing properly and was ultimately re-sutured by Dr. McCurdy.

On November 15, 1986, Ditto, who was concerned with the condition of her right breast, visited a general practitioner named Dr. Ronald Perry (Dr. Perry). Dr. Perry determined that her breast was infected and prescribed an antibiotic.

From approximately January through April of 1987, Ditto's breasts began to harden. Ditto testified that Dr. McCurdy, for the first time, told her that this condition happens to one out of every thirty patients. He instructed Ditto to massage her breasts ten minutes a day to alleviate the hardness.

The hardness persisted, however, and Ditto subsequently returned to Dr. McCurdy's office on May 14, 1987. During this visit Dr. McCurdy performed a closed capsulotomy. This procedure involves manually crushing the implants until the hardness disappears. *Craft v. Peebles,* 78 Hawai'i 287, 291 n. 2, 893 P.2d 138, 142 n. 2 (1995). A closed capsulotomy is an extremely painful procedure performed without anesthesia.[6] Ditto screamed during the procedure and placed a towel in her mouth after being admonished by Dr. McCurdy that other patients could hear her. Dr. McCurdy performed this procedure on two separate occasions, with the second being performed on September 2, 1987. Unfortunately, both closed capsulotomy procedures were unsuccessful.

In between the closed capsulotomy procedures, Dr. McCurdy recommended an open capsulotomy. "An open capsulotomy is a surgical procedure in which the doctor makes an incision into the breast in order to rupture the scar tissue surrounding the implant." *Id.* at 291 n. 3, 893 P.2d at 142 n. 3. Ditto was thus placed under general anesthesia and underwent her fourth surgery on July 15, 1987.

---

**5.** A hematoma is "a localized collection of blood, usually clotted, in an organ, space, or tissue, due to a break in the wall of a blood vessel." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 331 (Richard Sloane ed.1987).

**6.** Dr. Ralph Lassa (Dr. Lassa), an expert witness for Ditto, explained during his direct examina-

tion that the procedure involves "squeezing the woman's breast by the surgeon in such a fashion as to try to rip the scar that surrounds the implant.... And the technique was usually grasping the breast above and below and squeezing it or from side to side and squeezing it or them. And it is aggressive and it hurts."

Seven days later, on July 21, 1987, Ditto returned to Dr. McCurdy's office. Her breasts were again hard, painful and, at this point, oozing black blood from both incisions. Dr. McCurdy was in San Francisco, however, so Ditto was seen by his medical assistant, Karla Scarpiova (Scarpiova). Scarpiova changed Ditto's dressing, taped up her open incisions, and sent her home. But Ditto returned the next day because her open wounds had saturated the bandages. Scarpiova then, with Dr. McCurdy's consent, "stitched up" Ditto's open wounds.

In spite of numerous visits, medication, and procedures, Ditto's problems continued. On October 16, 1987, Ditto saw Dr. McCurdy yet again. Operation number five, an open capsulotomy, was performed during this visit. In the days following this procedure, her pain and bleeding continued, with blood at one point "draining down" her stomach.

Her pain intensified in the days that followed and she ultimately returned to Dr. McCurdy a few days after her second open capsulotomy for her final substantive visit. During this visit Dr. McCurdy attempted to drain the blood from Ditto's breasts with a needle. When this procedure failed Dr. McCurdy recommended that he perform surgery the following day. Still bleeding, Ditto returned home.

By the time she reached home her shirt was saturated with blood. After unsuccessfully trying to reach Dr. McCurdy by phone, Ditto went to Tripler Army Medical Center's (Tripler) Emergency Room. A plastic surgeon at Tripler told Ditto that her breasts were infected and that the implants had to be removed. Although Dr. McCurdy disagreed, recommending additional surgery to soften

her breasts, Ditto refused, opting instead to have the implants removed. Consequently, in October of 1987, Ditto underwent her sixth surgical procedure and had her right implant removed at Tripler. Her seventh and final operation—removal of the left implant—was performed approximately one year later in San Antonio, Texas.[7]

### B. *Procedural History*

Ditto filed a fraud and negligence claim against Dr. McCurdy and Scarpiova on July 25, 1989. A jury trial commenced on June 10, 1992. On June 30, 1992, the jury returned a unanimous verdict in favor of Ditto.[8]

The trial court filed its initial judgment on July 7, 1992. Dr. McCurdy's subsequent motions for new trial, (JNOV), and reconsideration were denied, and the trial court entered its amended judgment (reflecting an award of prejudgment interest and costs) on August 9, 1993.[9] Dr. McCurdy then filed a timely notice of appeal.

### II. *DISCUSSION*

Dr. McCurdy raises a number of points of error that he contends necessitate either an outright judgment in his favor, or, in the alternative, a new trial. We address the issues raised in his motion for JNOV, motion for new trial, and those issues preserved below and raised in his appellate brief, respectively.

### A. *Motion For JNOV*

Dr. McCurdy presented an oral motion for JNOV on the issue of punitive damages before the trial court on July 1, 1992.[10] The

---

7. Aside from Ditto's grave physical maladies, she suffered severe emotional trauma as well. Dr. Sandra Paulsen, a clinical psychologist who examined Ditto after the sixth surgery, testified that Ditto suffers from post-traumatic stress syndrome and major depression. This testimony was partly contradicted by psychiatrist Dr. Byron Howard. He testified on behalf of Dr. McCurdy that, in his opinion, while Ditto did have a "long standing depressive neurosis that was aggravated by the surgical outcome, she was not suffering from post traumatic stress syndrome."

8. Although the jury found Dr. McCurdy and Karla Scarpiova (Scarpiova) negligent, and found

that Dr. McCurdy or Scarpiova engaged in fraudulent conduct, the trial court later vacated the judgment against Scarpiova on November 6, 1992. Scarpiova is not a party to this appeal.

9. *See supra* note 1.

10. Dr. McCurdy repeated his challenges to the punitive damages award in his July 17, 1992 motion for new trial. We do not, therefore, address the issue in our motion for new trial discussion.

trial court denied the motion immediately after Dr. McCurdy's argument and entered its written order on July 20, 1992.

On appeal, Dr. McCurdy attacks the punitive damages award on a number of fronts. In general, he contends there was insufficient evidence to support the award, it was excessive, and that there was no evidence of his financial condition produced at trial.[11] We address each argument in turn.

### 1. Standard of Review.

We review the denial of JNOV motions *de novo*. *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 502, 880 P.2d 169, 177 (1994) (citing *Mehau v. Reed*, 76 Hawai'i 101, 112, 869 P.2d 1320, 1331 (1994) (citation omitted)). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Id.* (quoting *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974)). Substantial evidence is defined as " 'credible evidence [that] is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.' " *Id.* (quoting *In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (citations omitted)) (first brackets added). In deciding JNOV motions, "the evidence and inferences [that] may be fairly drawn therefrom must be considered in the light most favorable to the non-moving party and [the] motion may be granted only where there can be but one reasonable conclusion as to the proper judgment." *Id.* (citing *Mehau*, 76 Hawai'i at 112, 869 P.2d at 1331) (citations omitted).

### 2. Appellate Review of Punitive Damages.

In assessing the jury's role in this process, we recognize that the "[a]ward or denial of punitive damages is within the sound discretion of the trier of fact." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74

Haw. 85, 138, 839 P.2d 10, 36 (1992) (citing *Sterling v. Velsicol Chemical Corp.*, 647 F.Supp. 303, 323 (W.D.Tenn.1986), *rev'd in part on other grounds*, 855 F.2d 1188 (1988); *Haskins v. Shelden*, 558 P.2d 487, 494 (Alaska 1976); *Newman v. Basin Motor Co.*, 98 N.M. 39, 644 P.2d 553, 558 (N.M.Ct.App. 1982); *Restatement (Second) of Torts* § 908 cmt. d (1979)). We will not reverse a trier of fact's decision to grant or deny punitive damages absent a clear abuse of discretion. *Id.*, 839 P.2d at 37 (citing *Haskins*, 558 P.2d at 494).

"In determining whether an award of punitive damages is appropriate, the inquiry focuses primarily upon the defendant's mental state, and to a lesser degree, the nature of his [or her] conduct." *Masaki v. General Motors Corp.*, 71 Haw. 1, 7, 780 P.2d 566, 570 (1989) (citing D. Dobbs, *Handbook on the Law of Remedies* § 3.9, at 205 (1973)). " '[A] positive element of conscious wrongdoing is always required.' " *Id.*, 780 P.2d at 571 (quoting C. McCormick, *Handbook on the Law of Damages* § 77, at 280 (1935)). There must be more than mere commission of a tort to justify a punitive damages award. *Id.* There must be "willful, malicious, wanton or aggravated wrongs where a defendant has acted with a reckless indifference to the rights of another." *Goo v. Continental Casualty Co.*, 52 Haw. 235, 239, 473 P.2d 563, 566 (1970) (citing *Glover, Ltd. v. Fong*, 40 Haw. 503 (1954); *Howell v. Associated Hotels, Ltd.*, 40 Haw. 492 (1954); *Bright v. Quinn*, 20 Haw. 504 (1911)).

In addition, we must review the evidence to determine if

[t]he plaintiff [has] prove[d] by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or [with] . . . wilful misconduct or that

---

11. We decline to address Dr. McCurdy's challenge of the trial court's punitive damages instruction because he did not properly preserve the alleged error for appeal. His objection below was that the instruction was cumulative and "inaccurately stated the law." He now claims that the trial court's instructions were "vague, milktoast, and utterly lacking in *Haslip* criteria."

"We will disregard a point of error if the appellant fails to present discernable argument on the alleged error." *Bank of Hawaii v. Shaw*, 83 Hawai'i 50, 52, 924 P.2d 544, 546 (App.1996) (citing *Hall v. State*, 10 Haw.App. 210, 218, 863 P.2d 344, 348, *cert. denied*, 76 Hawai'i 246, 75 Haw. 581, 868 P.2d 464 (1993)), *cert. denied*, 83 Hawai'i 409, 927 P.2d 417 (1996).

entire want of care [that] would raise the presumption of a conscious indifference to consequences.

*Masaki,* 71 Haw. at 16–17, 780 P.2d at 575 (citing *Bright,* 20 Haw. at 504).

█ Furthermore, to determine whether an award is excessive, we examine whether it is supported by the evidence and not "so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the jury in assessing damages acted against rules of law or suffered their passions or prejudices to mislead them." *Kang v. Harrington,* 59 Haw. 652, 663, 587 P.2d 285, 291 (1978) (quoting *Vasconcellos v. Juarez,* 37 Haw. 364, 366 (1946)) (citations omitted). Other jurisdictions have also used the "shocks the conscience" guideline. In other words, an award is excessive if it shocks the conscience of the appellate court. *See, e.g., Chrysler Credit Corp. v. Turner,* 553 So.2d 64, 67 (Ala.1989); *Gillespie v. Seymour,* 255 Kan. 774, 877 P.2d 409, 412 (1994); *Janda v. City of Detroit,* 175 Mich.App. 120, 437 N.W.2d 326, 331 (1989); *Sessums v. Northtown Limousines, Inc.,* 664 So.2d 164, 169–170 (Miss.1995); *Reccko v. Criss Cadillac Co., Inc.,* 610 A.2d 542, 546 (R.I.1992); *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 312–13 (Utah 1982).[12]

█ Although our courts have not explicitly adopted rigid factors that trial and appellate courts must consider when reviewing an award, the "proper measurement of punitive damages should be '[t]he degree of malice, oppression, or gross negligence [that] forms the basis for the award and the amount of money required to punish the defendant....'" *Kang,* 59 Haw. at 663, 587 P.2d at 291 (quoting *Howell,* 40 Haw. at 501). And, as other courts have recognized, an "almost *de novo*" standard of review is necessary to provide "sufficiently definite and meaningful restraints" and thus satisfy due process. *Johnson v. Hugo's Skateway,* 974 F.2d 1408, 1414 (4th Cir.1992) (citing *Pacific*

*Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20, 111 S.Ct. 1032, 1044–45, 113 L.Ed.2d 1 (1991)). Scrutiny of the trial court's post-verdict review is required as well.

█ As a threshold matter, we conclude that the trial court's post-verdict review was adequate. The court conducted a hearing on Dr. McCurdy's motion for JNOV and allowed Dr. McCurdy to present his argument. After listening to Dr. McCurdy's argument and reviewing the evidence, the trial court stated:

> This Court is of the belief specifically that negligence by Dr. McCurdy was fully supported by the evidence adduced. Fraud by [Dr. McCurdy] ... [was] fully supported by the evidence adduced, specifically by defendant[']s act and conduct;[13] that the award of punitive damages against the defendant[ ] was also supported by this evidence adduced at the time of trial.

We hold that the trial court's post-verdict review satisfies due process.

### 3. There Was Ample Evidence to Support the Punitive Damages Award.

█ Dr. McCurdy alleges that "[w]hile Ditto tendered evidence of negligence, there was no testimony of malice or evil motive." Consequently, he argues, there was no evidence to allow the jury to consider an award of punitive damages. We disagree. As noted above, punitive damages are also awardable for "gross negligence."

Based on our review of the record, we conclude there was an abundance of evidence adduced at trial that the jury could have relied on to find that Dr. McCurdy's care of Ditto, from the beginning, was reckless and consciously indifferent to the consequences that could arise, amounting to gross negligence and willful misconduct. For example, there was substantial evidence produced at trial, which, if believed, revealed that: the medical history portion of Dr. McCurdy's consultation was woefully inadequate; Dr. McCurdy did not properly inform Ditto of

12. The lone Hawai'i case that explicitly used the "shocks the conscience" standard in modern times when assessing the size of a punitive damages award was *Silva v. Bisbee,* 2 Haw.App. 188, 192, 628 P.2d 214, 217 (1981).

13. The trial court's reference to fraud referred to Dr. McCurdy's allegation in the motion for judgment notwithstanding the verdict that Ditto failed to prove the elements of fraud during the trial.

the risks or complications involved in the initial surgical procedure or any of the subsequent surgical procedures; he sent Ditto home after her second surgery, despite continued complications, to make room for other patients in his recovery room; he failed to properly suture her incisions, resulting in constant bloody discharges; he failed to document medications allegedly prescribed to Ditto; he failed to properly diagnose an obvious infection; and he allowed his medical assistant to suture Ditto's incision when he was not physically present.[14]

■ "It has long been the law in this jurisdiction that verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support a jury's findings." *State Sav. & Loan Assoc. v. Corey*, 53 Haw. 132, 141, 488 P.2d 703, 709 (1971) (citations omitted), *cert. denied*, 406 U.S. 920, 92 S.Ct. 1774, 32 L.Ed.2d 119 (1972). Contrary to Dr. McCurdy's contention, there was substantial evidence on which the jury could have based its award of punitive damages. *See infra* part II.B.2.a.iii. We hold, therefore, that the trial court properly allowed the issue of punitive damages to be considered by the jury and that the jury did not abuse its discretion in making the award.

### 4. The Punitive Damages Award Was Not Excessive.

Relying on *Kang*, Dr. McCurdy argues that the punitive damages award was excessive and should be set aside. We disagree.

■ There is no bright-line rule to determine whether a punitive damages award is excessive. Applying the principles of *Kang*, however, we are satisfied that the jurors did not allow passions or prejudices to mislead them. As we explained in the preceding section, there was ample evidence of gross negligence and willful misconduct. The jury could have reasonably determined that a $600,000 punitive damages award was warranted, given the extreme nature of Dr. McCurdy's conduct and the severity of Ditto's injuries, coupled with the need to deter future similar conduct.

We hold that the award, which is sixty percent of the compensatory damages awarded, does not shock this court's conscience and is thus not excessive.

### 5. Evidence of Financial Condition Was Not Required.

Dr. McCurdy next claims that Ditto was required to produce evidence of Dr. McCurdy's financial condition. We disagree.

■ "The failure to show net worth does not necessarily invalidate a punitive [damages] award but only eliminates a factor in which to gauge the reasonableness of the award." *Romero v. Hariri*, 80 Hawai'i 450, 458, 911 P.2d 85, 93 (App.1996) (citing *Fahrenberg v. Tengel*, 96 Wis.2d 211, 291 N.W.2d 516, 527 (1980)). Moreover, it is in the defendant's best interest to put on evidence of financial condition when punitive damages are being considered because "the defendant ... always has it in his [or her] power to present the real facts to the jury in answer to the general proof of the plaintiff." *Id.* (quoting *Draper v. Baker*, 61 Wis. 450, 21 N.W. 527, 529 (1884)) (brackets in original).

■ In any event, the record reveals that some evidence of Dr. McCurdy's financial condition was in fact presented to the jury. Ditto, for example, testified that she paid $2,000 (a discounted price) for her procedure. Dr. McCurdy later testified that he, at one point, performed 130 breast augmentations per year at $3,000 per procedure. Thus, the jury was aware that Dr. McCurdy generated approximately $390,000 per year through a portion of his practice.

In *Romero*, we upheld a punitive damages award where the defendant failed to put on evidence of financial worth beyond the plaintiff's testimony. *Id.* "Defendant had the opportunity," we held, "to present evidence [that] accurately portrayed his financial status." *Id.* Similarly, in the instant case, we reject Dr. McCurdy's argument that the pu-

---

**14.** Dr. Lassa testified that "the infection and subsequent surgeries were a direct result of lack of appropriate treatment of her initial surgical experience ... which could ... most likely have been avoided by immediate return to the operating room under sterile conditions...." *See infra* part II.D.3.

nitive damages award was not supported by evidence of financial condition, for it was he who failed to introduce evidence of his financial worth beyond the testimony during trial. *See id.*

Based on the foregoing discussion and our *de novo* review of the record, we conclude that there was no abuse of discretion by the trier of fact in awarding punitive damages. Accordingly, we hold that the motion for JNOV was properly denied by the trial court.

## B. *Motion For New Trial*

Dr. McCurdy filed a motion for new trial on July 17, 1992. The trial court issued an order denying the motion on November 6, 1992. Dr. McCurdy now raises two issues previously raised in his motion for new trial. Specifically, he challenges the testimony of two expert witnesses produced by Ditto and the special verdict form used by the trial court. Because we agree with Dr. McCurdy's argument concerning the expert testimony on the issue of hospital privileges, we do not address the special verdict form point of error.

### 1. *Standard of Review.*

"Both the grant and denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion." *Richardson,* 76 Hawai'i at 503–04, 880 P.2d at 178–79 (citing *Harkins v. Ikeda,* 57 Haw. 378, 380, 557 P.2d 788, 790 (1976)). A trial court abuses its discretion when it "clearly exceed[s] the bounds of reason or disregard[s] rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* at 504, 880 P.2d at 179 (quoting *Amfac,* 74 Haw. at 114, 839 P.2d at 26 (citation omitted)).

■ In addition, "[t]he general rule is that [the] admissibility of expert testimony is a matter within the broad discretion of the trial judge, and his [or her] decision will not be overturned ... unless manifestly erroneous or clearly an abuse of discretion." *State v. Matias,* 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (quoting *State v. Murphy,* 59 Haw. 1, 14, 575 P.2d 448, 457 (1978)).

### 2. *Expert Testimony.*

Dr. McCurdy challenges the trial court's admission of expert testimony by Dr. Ralph Lassa (Dr. Lassa) during Ditto's case-in-chief and by Dr. Don Parsa (Dr. Parsa) during rebuttal.

#### a. *Dr. Lassa's testimony was properly allowed.*

Dr. McCurdy asserts that Dr. Lassa was unqualified to testify about the ABCS or Dr. McCurdy's qualifications because Dr. Lassa is not a member of the ABCS and did not review Dr. McCurdy's curriculum vitae (a brief biographical resume). He also contends that Dr. Lassa's testimony was "out of order," in that he gave opinion testimony "before any facts had been established upon which to base his expert. opinions." Dr. McCurdy further claims that the opinions were "speculative, couched in 'possibilities,' and based on assumptions later shown false." As a result, he argues, the trial court abused its discretion by allowing the testimony. We disagree.

#### i. *Dr. Lassa's qualifications to testify.*

■ We are not persuaded by Dr. McCurdy's claim that Dr. Lassa was unqualified to give an opinion in this case.

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his [or her] opinion or inference-drawing would probably aid the trier of fact in arriving at the truth. Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

*Lai v. St. Peter,* 10 Haw.App. 298, 313, 869 P.2d 1352, 1360 (1994) (quoting *Larsen v. State Sav. & Loan Ass'n,* 64 Haw. 302, 304, 640 P.2d 286, 288 (1982)). Moreover, under Hawai'i Rules of Evidence (HRE) Rule 702,[15]

15. Hawai'i Rules of Evidence (HRE) Rule 702 provides, in relevant part: "If scientific, techni-

we believe expert testimony should be liberally admitted at trial.

■ In this case, Dr. Lassa was called by Ditto as an expert in plastic and reconstructive surgery. The trial court found Dr. Lassa qualified as an expert to testify about breast augmentation surgery. It did so after extensive *voir dire*, in which Dr. Lassa testified that he: (1) is licensed to practice medicine in both Illinois and California; (2) is certified by the American Board of Plastic and Reconstructive Surgery and the American Society of Pediatric Plastic Quality Assurance and Utilization Review; (3) has practiced as a plastic surgeon since 1977; (4) is on the clinical faculty of Community Hospital, Sonoma County, which has a family practice extension of the University of California at San Francisco; (5) is a fellow in the American Academy of Pediatrics as a plastic surgery fellow; and (6) has performed well over 500 breast augmentation operations. His testimony was used to establish the standard of care for plastic surgeons.

In light of this evidence, we conclude that the trial court did not abuse its discretion in qualifying Dr. Lassa as an expert witness. The fact that Dr. Lassa was neither board certified by the ABCS nor familiar with its charters or rules is inconsequential, especially in light of Dr. Randolph Howes' (Dr. Howes) testimony at trial that the standard of care is the same for both cosmetic and plastic surgeons. (Dr. Howes was an expert witness for Dr. McCurdy.) Dr. Lassa's lack of familiarity with the ABCS goes to the weight, rather than the admissibility of his testimony. *Id.* at 314–15, 869 P.2d at 1361.

### ii. *Order of expert testimony.*

■ Although "[o]pinions of expert witnesses must [generally] be based upon facts in evidence," *Loevsky v. Carter,* 70 Haw. 419, 431, 773 P.2d 1120, 1127 (1989) (citations omitted), there is no requirement that expert testimony follow, rather than precede, the facts upon which the expert bases his or her opinion. *Lai,* 10 Haw.App. at 310, 869 P.2d at 1359. In fact, the under-

lying facts that support the opinion need not be admissible. As HRE Rule 703 explains:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

■ The record in this case reveals that Dr. Lassa gave expert testimony after reviewing facts made known to him before the trial and that those facts were subsequently introduced into evidence. We hold, therefore, that the order of Dr. Lassa's testimony is immaterial.

### iii. *Untrustworthiness of Dr. Lassa's testimony.*

Dr. McCurdy's contention of "untrustworthiness" is equally without merit. Rule 703 explains that the trial court may prohibit expert testimony if the "underlying facts or data indicate lack of trustworthiness." HRE Rule 703. The commentary to HRE Rule 703 further states that "[t]he facts or data must be established as reliable in the particular field." Commentary to HRE Rule 703.

■ Nothing in the record below indicates that the underlying facts or data relied on by Dr. Lassa were novel, controversial, or unreliable. Dr. Lassa simply testified about the standard of care for breast augmentation surgery and Dr. McCurdy's alleged breach of that standard based on Dr. Lassa's experience as a plastic surgeon. He had a sound factual foundation and drew on his medical expertise in the area of breast augmentation. *See Aga v. Hundahl,* 78 Hawai'i 230, 238–39, 891 P.2d 1022, 1030–31 (1995). For example, Dr. Lassa testified that Dr. McCurdy breached the standard of care by: failing to obtain informed consent; performing surgery in the recovery room without adequate aseptic (sterile) techniques; failing to re-explore Ditto's wound and remove clots after observing

---

cal, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

blood oozing through the wound; failing to properly suture Ditto's incision, leaving her susceptible to infection; and allowing a non-physician assistant to suture an incision outside of his presence.

We believe, based on Dr. McCurdy's contention that Dr. Lassa's testimony was "speculative, couched in 'possibilities,' and based on assumptions later shown false," that Dr. McCurdy is essentially arguing Dr. Lassa was not a credible or believable witness. Credibility, however, is a fact question to be decided by the jury. HRE Rule 1102 (the jury is the exclusive judge "of all questions of fact and the credibility of witnesses"). Moreover, "extensive cross-examination of the expert so as to elicit his [or her] assumptions and test his [or her] data" is a more practical truth-seeking method than the exclusion of relevant opinion testimony. 3 J. Weinstein, et al., *Weinstein's Evidence* § 703(03) (1988).

The trial court's admission of Dr. Lassa's testimony did not clearly exceed the bounds of reason or disregard rules or principles of law. We hold that the admission of his testimony, then, was not an abuse of discretion.

b. *The trial court abused its discretion by allowing Dr. Parsa to testify about hospital privileges.*

Dr. McCurdy also challenges the rebuttal testimony offered by Dr. Parsa. The trial court abused its discretion, Dr. McCurdy argues, by allowing irrelevant testimony from an unqualified, unlisted, "surprise" rebuttal witness who did not refer to any evidence offered by Dr. McCurdy during the trial. Because we agree that the trial court abused its discretion by allowing Dr. Parsa to testify about hospital privileges during rebuttal, we need not address Dr. McCurdy's other contentions involving Dr. Parsa's testimony.

As we previously stated, Dr. Howes, a board certified cosmetic surgeon, was called as an expert witness by Dr. McCurdy. On cross-examination, Ditto unsuccessfully attempted to question Dr. Howes about hospital privileges. Dr. Howes' responses to questions about Dr. McCurdy's ability to obtain hospital privileges were stricken from the record by the trial court because the issue was outside the scope of direct examination.

Later, on redirect examination of Dr. Howes, Dr. McCurdy unsuccessfully pursued the issue of hospital privileges. Consequently, the issue was never an official part of Dr. McCurdy's case-in-chief.

■ In the rebuttal portion of the trial, Ditto called Dr. Parsa, the acting Chief of Surgery at Queen's Medical Center and Chief of Plastic Surgery at the John A. Burns School of Medicine, to testify that Dr. McCurdy cannot obtain hospital privileges in Hawai'i. Dr. Parsa testified that a residency in plastic surgery is a minimum prerequisite for performing breast surgery at all of the major island hospitals. He reviewed Dr. McCurdy's curriculum vitae, concluded that Dr. McCurdy had not in fact completed a plastic surgery residency, and hence would probably not be granted hospital privileges to perform breast surgery at Queen's Medical Center. Dr. Parsa's testimony, then, rebutted evidence that did not exist.

During closing argument, Ditto relied on the hospital privileges issue to partially support her claim that Dr. McCurdy committed fraud. For example, in setting up the issues for the jury, she explained: "The first issue is a very simple one. Does a physician ... who does not have hospital privileges to perform [breast surgery] ... have a duty, and obligation to tell his patients about the limitations on his normal training and credentials." Ditto then reiterated during rebuttal argument: "Dr. McCurdy is not qualified to perform the surgery that he performed on my client in any hospital in this State. He couldn't do this surgery at Queen's, at St. Francis, at Kuakini, at Kapiolani, or at any other hospital." She further reminded the jury that Dr. Parsa "says hospital privileges are something to tell you as a consumer or as a patient that the doctor has been approved by his peer [sic]."

It is clear that hospital privileges played a substantial role in Ditto's fraud argument before the jury. But given that hospital privileges were beyond the scope of Ditto's case-in-chief, and the fact that the trial court had previously refused to allow testimony about hospital privileges during the presenta-

tion of Dr. McCurdy's case, the jury should not have been allowed to consider the testimony of Dr. Parsa. Further, Ditto should not have been allowed to use the issue to support her fraud allegation during closing argument.

 Dr. Parsa's testimony about hospital privileges contravened the common law rule that prevents a plaintiff from presenting testimony during rebuttal that goes beyond the parameters of a defendant's case. Although the introduction of evidence and testimony is within the trial court's discretion, "as a general rule, a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of its position to offer on rebuttal." *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 496, 923 P.2d 903, 913 (1996); *Yorita v. Okumoto*, 3 Haw.App. 148, 157, 643 P.2d 820, 827 (1982). Fraud was an issue from the onset of Ditto's case. It was an allega-

tion in her complaint and was touched on by Dr. Lassa concerning the differences between cosmetic and plastic surgeons. Clearly, Ditto should have called Dr. Parsa during the presentation of her case-in-chief, as his testimony would have made the existence of Dr. McCurdy's alleged fraud more probable than without his testimony. HRE Rule 401.[16] We are baffled by Ditto's decision to reserve testimony about hospital privileges for rebuttal given the possible relationship between an alleged inability to perform surgery at a hospital stemming from a lack of qualifications and a physician's duty to disclose material facts to his or her patient.[17] We can discern no legitimate reason why Dr. Parsa was not called during the presentation of Ditto's case-in-chief. Thus, we conclude that it was error for the trial court to allow Dr. Parsa to testify about hospital privileges. As a result, Dr. Parsa's testimony, along with Ditto's subsequent argument before the jury, prejudiced a substantial right[18] of Dr.

---

**16.** This rule of evidence provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401.

**17.** The issue of fraud in this context implicates a complicated question, namely, the scope of a physician's duty of disclosure. In this regard, we adopt the New Mexico rule that "where a fiduciary duty or confidential relationship exists, as between a physician and a patient, a duty arises to disclose all material information concerning the patient's treatment." *Keithley v. St. Joseph's Hosp.*, 102 N.M. 565, 569, 698 P.2d 435, 439 (N.M.Ct.App.1984) (citing *Garcia v. Presbyterian Hosp. Center*, 92 N.M. 652, 593 P.2d 487 (N.M.Ct.App.1979)), *writ quashed by Murrell v. Keithley*, 102 N.M. 565, 698 P.2d 435 (N.M. 1985); *see Han v. Yang*, 84 Hawai'i 162, 173, 931 P.2d 604, 615 (App.1997) (holding fiduciary has duty of full, fair, complete, and timely disclosure of material facts). Further, "material information" about a patient's treatment or a physician's qualifications is a question of fact. Thus, the fact-finder must decide whether the qualifications at issue were material and should have been disclosed to the patient. What constitutes material qualifications (or nonqualifications) will vary depending on the facts and issues of each particular case.

Thus, on retrial the issue of materiality will be decided by the jury using, for example, factors similar to jury instruction number 42:

1. Dr. McCurdy must have concealed or suppressed a material fact;

2. Dr. McCurdy must have been under a duty to disclose the fact to Janie Ditto;

3. Dr. McCurdy must have intentionally concealed or suppressed the fact with the intent to defraud Janie Ditto;

4. Janie Ditto must have been unaware of the fact and would not have acted as she did if she had known of the concealed or suppressed fact;

5. And, finally, as a result of the concealment or suppression of the fact, Janie Ditto must have sustained damages.

Furthermore, we disagree with the dissent's contention that "[t]he dispositive issue ... is whether Dr. McCurdy ... had a duty to inform Ditto that he was *not certified* as a plastic surgeon." Dissenting Opinion at 131, 947 P.2d at 999. We simply cannot determine what the dispositive issue was in the previous trial because Ditto argued that Dr. McCurdy committed fraud by both the failure to disclose that he was not a plastic surgeon *and* that he allegedly did not have hospital privileges. Moreover, the dispositive issue in the new trial has not been determined as a matter of law. The jury will decide, based on the evidence presented at trial, whether board certification, medical specialties, hospital privileges, or any other issue were material facts based on the facts and circumstances of Dr. McCurdy's relationship with Ditto.

**18.** "The term 'substantial right' has been defined generally as embracing the idea of a legal right—something to which a party may lay claim as being legally entitled to." *State v. Sacoco*, 45 Haw. 288, 292, 367 P.2d 11, 13 (1961) (citing

McCurdy by subjecting him to fraud liability in violation of the common law rule in *Takayama.*

Accordingly, we hold that the trial court's failure to grant in part Dr. McCurdy's motion for new trial on the issue of fraud was an abuse of discretion, but that the trial court did not abuse its discretion in denying Dr. McCurdy's motion based on the testimony of Dr. Lassa.[19]

### C. *Prejudgment Interest*

 Dr. McCurdy next argues that the trial court lacked jurisdiction to award prejudgment interest, applied the wrong standards, and prejudgment interest cannot be applied to punitive damages. We agree in part.[20]

#### 1. *Standard of Review.*

 "The award of pre-judgment interest is solely within the discretion of the trial court." *Azer v. Myers,* 8 Haw.App. 86, 120, 793 P.2d 1189, 1210–11 (citations omitted), *aff'd in part, rev'd on other grounds,* 71 Haw. 506, 795 P.2d 853 (1990). We thus review the trial court's decision to grant prejudgment interest for abuse of discretion.

#### 2. *A Motion for Prejudgment Interest is a Motion to Alter or Amend a Judgment.*

When Ditto's motion for prejudgment interest was filed in 1992, both the Federal Rules of Civil Procedure (FRCP) and Hawai'i Rules of Civil Procedure (HRCP) versions of Rule 59(e) stated that a "motion to alter or amend the judgment shall be *served* not later than 10 days after entry of the judgment." (Emphasis added.) In 1995, the federal rule was "amended to provide that a motion for new trial or to alter or amend a judgment must be *filed* within 10 days from the entry of judgment, rather than requiring the motion to be *served* within that period." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* 39 n. 3 (1995) (emphasis added). The comparable Hawai'i rule has not been similarly revised.

 Dr. McCurdy claims that Ditto's July 21, 1992 motion for prejudgment interest was a motion to alter or amend the judgment and was thus subject to the time requirements of HRCP Rule 59(e). Because Ditto filed her motion fourteen days after the July 7, 1992 judgment,[21] Dr. McCurdy also argues that the trial court lacked jurisdiction to entertain the motion for prejudgment interest. We agree that a motion for prejudgment interest is a motion to alter or amend the judgment under HRCP Rule 59(e). We are, however, unable to discern from the record whether Ditto's motion was timely under HRCP Rule 59(e). Accordingly, we remand for proceedings to determine this issue.

---

*Armstrong v. Herancourt Brewing Co.,* 53 Ohio St. 467, 42 N.E. 425, 427 (1895)).

**19.** We pause to note that *amici* ABCS' points of error have been considered and rejected. As the ABCS correctly points out, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), was decided a full year after the trial in the instant case. Still, we conclude that the *Daubert* principles would not have changed the outcome of the trial court's decision to qualify Dr. Lassa as an expert witness. *See supra* part III.B.2.a.i.

In addition, all of the instructions the ABCS asserts the trial court should have given to the jury were not requested by Dr. McCurdy at trial and thus have not been preserved for appeal.

**20.** Although Ditto argues that Dr. McCurdy did not properly preserve his argument on jurisdiction below, jurisdiction can be raised at any time

during a judicial proceeding, including as a new issue on appeal. As we explained in 1982:

> Ordinarily[,] a judgment will not be reversed on a legal theory not raised in the court below. An appellate court will deviate from this rule only when justice requires.... A court may properly render a judgment only if it has authority to adjudicate the type of controversy involved in the action.... And a judgment of a court without jurisdiction over the subject matter is suspect as to its validity. Thus, justice compels us to address the issue of the trial court's jurisdiction.

*In re Keamo,* 3 Haw.App. 360, 364, 650 P.2d 1365, 1369 (1982) (citations and footnote omitted).

**21.** Ditto's motion for prejudgment interest is signed by her counsel on July 17, 1992, but is stamp dated July 21, 1992 by the clerk of the First Circuit Court.

### a.

In 1989, the United States Supreme Court addressed the issue of whether a post-judgment motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under FRCP 59(e). *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). The Supreme Court considered the issue because of a "conflict in the Courts of Appeals[.]" *Id.* at 173, 109 S.Ct. at 990. *Compare Osterneck v. Ernst & Whinney,* 825 F.2d 1521 (11th Cir.1987) (holding a motion for prejudgment interest is a FRCP 59(e) motion) *with Jenkins v. Whittaker Corp.,* 785 F.2d 720 (9th Cir.1986) (holding a first-time motion for prejudgment interest is not a FRCP 59(e) motion but a motion subject to the general constraints of FRCP 7).

In *Osterneck,* plaintiff-petitioner Osterneck sued defendant-respondents Barwick Industries and Ernst & Whinney for federal securities violations. The jury returned a verdict against Barwick Industries but in favor of Ernst & Whinney, and the district court entered its judgment upholding the jury's findings. Following the judgment, Osterneck filed a motion for prejudgment interest. While his motion for prejudgment interest was still pending, Osterneck filed a notice of appeal from the judgment in favor of Ernst & Whinney.

Some months later, the district court granted Osterneck's motion for prejudgment interest and entered an amended judgment. Following the amended judgment, Osterneck filed a cross-appeal on an issue involving Barwick Industries, but failed to include Ernst & Whinney as a party to the appeal. On appeal, the Eleventh Circuit held that Osterneck's motion for prejudgment interest was a FRCP 59(e) motion. *Osterneck,* 825 F.2d at 1525. The court then dismissed Osterneck's appeal as to Ernst & Whinney for lack of jurisdiction because Osterneck did not file an effective notice of appeal after the amended judgment. *Id.* at 1526–28.

In reviewing the Eleventh Circuit's holding, the Supreme Court stated that "the Court of Appeals was correct to conclude that a postjudgment motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under Rule 59(e)." *Osterneck,* 489 U.S. at 175, 109 S.Ct. at 991. The Supreme Court offered two reasons for its conclusion. First, the Court has "repeatedly stated that prejudgment interest 'is an element of [plaintiff's] complete compensation.'" *Id.* (quoting *West Virginia v. United States,* 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987)) (brackets in original). Consequently, "unlike attorney's fees, which at common law were regarded as an element of costs and therefore not part of the merits judgment, ... prejudgment interest traditionally has been considered part of the compensation due plaintiff." *Id.* (citation omitted).

"Second, unlike a request for attorney's fees or a motion for costs, a motion for discretionary prejudgment interest does not 'rais[e] issues wholly collateral to the judgment in the main cause of action,' nor does it require an inquiry wholly 'separate from the decision on the merits....'" *Id.* (brackets in original) (citations omitted). When considering the amount, if any, of prejudgment interest, "a district court must examine—or in the case of a postjudgment motion, reexamine—matters encompassed within the merits of the underlying action." *Id.* at 176, 109 S.Ct. at 991.

The Court then summed its conclusion on FRCP 59(e) by explaining:

> These considerations are intertwined in a significant way with the merits of the plaintiff's primary case as well as the extent of his damages. Thus, we conclude that a postjudgment motion for discretionary interest involves the kind of reconsideration of matters encompassed within the merits of a judgment to which Rule 59(e) was intended to apply.

*Id.*

Although our appellate courts have not explicitly addressed the issue, we believe the Supreme Court's interpretation of FRCP 59(e) should guide our interpretation of HRCP Rule 59(e). *Cf. Richardson,* 76 Hawai'i at 501–02, 880 P.2d at 176–77 (construing Hawai'i Rules of Appellate Procedure (HRAP) 4(a)(4) the same as its federal counterpart). Therefore, we hold that a motion

for prejudgment interest is a motion to alter or amend a judgment under HRCP Rule 59(e) and must be served no later than ten days after entry of the judgment. *See McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 520 (7th Cir.1993) ("a motion for prejudgment interest is considered a Rule 59(e) motion ... [and] is subject to that rule's timing requirement—that it be served 'no later than 10 days after entry of judgment' ").

In reaching this conclusion, we are not persuaded by Ditto's argument that the trial court "specifically reserved jurisdiction to decide interest" in its initial judgment. In it's July 7, 1992 initial judgment, the trial court stated: "Prejudgment Interest and Cost, if any, shall be determined and taxed at a later date." In our opinion, this statement did not address any pending motions that had already been filed by Ditto, but rather was a generic statement anticipating appropriately and timely filed motions, if any, for prejudgment interest, attorney's fees, and costs.

 Furthermore, though it is true, as Ditto points out, that "Dr. McCurdy extended the deadline for filing an appeal by filing a motion for new trial on July 17, 1992," this motion had no relationship to Ditto's impending motion for prejudgment interest. Ditto's request for prejudgment interest was not served in response to Dr. McCurdy's motion for new trial; indeed, Ditto's response to that motion made no mention of prejudgment interest. As the Seventh Circuit observed when analyzing an identical claim: "We agree that the district court retained jurisdiction over the case, but that does not necessarily mean that it had jurisdiction to award prejudgment interest." *Id.* The Seventh Circuit further reasoned that, "[a]lthough a timely postjudgment motion opens up the earlier judgment and even permits the court to enlarge on the issues delineated by the motion, the non-moving party may not then make its own untimely request for alteration of the judgment on a wholly independent ground." *Id.* (citations omitted). We agree.

*b.*

As previously indicated, HRCP Rule 59(e) requires that a motion to alter or amend a

judgment "shall be served no later than ten days after entry of the judgment." Therefore, Ditto's motion for prejudgment interest was required to be served on Dr. McCurdy no later than July 17, 1992, ten days after July 7, 1992, the date of the initial judgment. We are unable, however, to determine whether Ditto's motion was timely because the date line in the Certificate of Service is blank. This presents an unusual set of circumstances. The record reveals a motion (1) dated by Ditto on July, 17, 1992 (2) filed by the court clerk on July 21, 1992, and (3) with an undated but signed Certificate of Service. This state of affairs requires a factual finding of when the motion was actually served on Dr. McCurdy. As a result, we remand the case to the trial court with instructions that it conduct a hearing to give Ditto an opportunity to show when the motion was served.

If the trial court determines that the motion was served after July 17, 1992, the motion shall be considered untimely and the trial court is instructed to issue an order denying Ditto's July 21, 1992 motion for prejudgment interest. *See Keith v. Truck Stops Corp. of Am.*, 909 F.2d 743, 747 (3d Cir.1990). If, on the other hand, the trial court finds that the motion was served no later than ten days after entry of the judgment, then the trial court, in the exercise of its discretionary authority to award prejudgment interest, was authorized to enter an order awarding prejudgment interest, subject, however, to the guidelines outlined in this opinion. Consequently, we review Dr. McCurdy's arguments regarding purposeful delay and prejudgment interest on punitive damages.

### 3. *Prejudgment Interest Does Not Require Purposeful Delay.*

Dr. McCurdy alleges that the trial court abused its discretion in awarding prejudgment interest because Dr. McCurdy did not cause any trial delays. We disagree.

 Prejudgment interest is governed by Hawai'i Revised Statutes (HRS) § 636–16 (1993). The statute reads:

In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the cir-

cumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the *injury first occurred* and in cases arising by breach of contract, it may be the date when the breach first occurred.

HRS § 636–16 (emphasis added). "One of the purposes of pre-judgment interest is to cut delays in litigation, and to undo substantial injustice caused by such delays." *Azer*, 8 Haw.App. at 120, 793 P.2d at 1211 (citing *McKeague v. Talbert*, 3 Haw.App. 646, 658 P.2d 898 (1983)).

■ Contrary to Dr. McCurdy's argument, though, there need be no demonstration of purposeful delay by the defendant. The trial court has the discretion to award prejudgment interest for any substantial delay in the proceedings. The legislative history of HRS § 636–16 confirms our interpretation of the statute. As the conference committee report explains: "Where the issuance of judgment is greatly delayed *for any reason*, such fixed commencement date can result in substantial injustice. Allowing the trial judge to designate the commencement date will permit more equitable results." *Wiegand v. Colbert*, 68 Haw. 472, 477, 718 P.2d 1080, 1084 (1986) (quoting Conf. Com. Rep. No. 67, on S.B. No. 1043, 1979 Sen. Journ., at 984) (emphasis added); *see Leibert v. Finance Factors, Ltd.*, 71 Haw. 285, 293, 788 P.2d 833, 838 (1990).

In the following excerpt, the trial court explained part of its rationale for granting prejudgment interest to Ditto: "My feeling is there was not anything [sic] significant in this case either at the time of events as they evolved, neither anything [sic] within the legal record which would show her dilatory actions." The court thus concluded, there being no purposeful delay by Ditto, that it could properly award prejudgment interest.

We agree and hold that a trial court can award prejudgment interest for any substantial delay in the proceedings, and that no purposeful delay on the part of the non-moving party is required. *See infra* note 22.

■ In our case, the trial court designated the commencement date as October 23, 1986, the date of Ditto's initial consultation with Dr. McCurdy. The trial court selected this date because Ditto's complaint, proffered testimony, and argument alleged that Dr. McCurdy's first negligent acts were an inadequately performed examination, an insufficient medical history, and failure to obtain informed consent, all taking place or beginning during the initial consultation. *See supra* note 3. In our assessment, the trial court, exercising its discretionary authority, had a rational basis for determining when Ditto's injury first occurred. The initial judgment was not entered until July 7, 1992. Hence, there was a five year and nine month delay from the initial consultation until the initial judgment. Unquestionably, then, the issuance of judgment was greatly delayed. Consequently, we hold that the trial court's award of prejudgment interest was not an abuse of discretion.

### 4. Prejudgment Interest May Not be Assessed on Punitive Damages.

Dr. McCurdy contends that the trial court improperly assessed prejudgment interest by applying a 6.5 percent multiplier to the jury's entire award, including the punitive damages portion. We agree.

■ Ditto argues that "[t]here is no iron-clad rule which precludes prejudgment interest on punitive damages." She is mistaken. The clear, succinct, and nearly universal rule of law is this: "[A] litigant is not entitled to prejudgment interest on the *punitive* damages portion of a judgment. . . ." *Calleon v. Miyagi*, 76 Hawai'i 310, 322, 876 P.2d 1278, 1290 (1994) (quoting *Digital & Analog Design Corp. v. North Supply Co.*, 63 Ohio St.3d 657, 660, 590 N.E.2d 737, 740 (1992)). As our supreme court observed in *Calleon*, there is a distinct difference between prejudgment interest and punitive damages: "Awarding prejudgment interest on compensatory damages . . . ensures that just compensation to the tort victim is not eroded by the dilatory tactics of the tortfeasor, and *comprises a sanction wholly separate from any punitive damages awarded.*" *Id.* (quoting *Digital*, 63 Ohio St.3d at 660–61, 590 N.E.2d at 741) (emphasis added); *see Masaki*, 71 Haw. at 7, 780 P.2d at 570 ("the purpose of punitive damages is not compen-

sation of the plaintiff but rather punishment and deterrence, such damages are awarded only when the egregious nature of the defendant's conduct makes such a remedy appropriate").[22]

In the case below, the trial court applied a 6.5 percent multiplier to the jury's award, without first deducting the punitive damages amount. Clearly, under the common law of this jurisdiction, the trial court should have excluded the punitive damages from the compensatory damages when it calculated prejudgment interest.

Accordingly, if the trial court determines that Ditto's motion for prejudgment interest was served no later than ten days after entry of the judgment, we affirm that portion of prejudgment interest awarded on special and general damages only. But we direct the trial court to recalculate the award using the ten percent rate of interest dictated by HRS § 478–2 (1993).[23] Further, we reverse that portion of the prejudgment interest awarded on punitive damages and vacate that portion of the prejudgment interest awarded on fraud damages and remand with instructions to determine whether Ditto should be awarded prejudgment interest on fraud damages, if any are awarded in favor of Ditto.

### D. Jury Instructions

Dr. McCurdy next challenges a number of the trial court's jury instructions. He argues that the court gave improper instructions on informed consent, fraud, and expert medical testimony. In light of our holding in *supra*

part II.B.2.b, we do not review the fraud instruction.

### 1. Standard of Review.

There are two lines of cases in our jurisdiction that apply different standards of review (*de novo* and abuse of discretion) to a trial court's refusal of a requested jury instruction. The first line, which dates back to at least 1872, originally succinctly held that it was not error for a trial court to refuse instructions that were "sufficiently and substantially included in the instructions given." *In re Nakuapa*, 3 Haw. 400, 402 (1872) (en banc); *J.C. Merrill & Co. v. Jaeger*, 5 Haw. 475, 483 (1885) ("We understand the rule of law to be that the Court is not required to put propositions to the jury, although correct, in the very language used by counsel, nor, further, is required to give again, in the terms proposed by counsel, what has already been given."). Subsequent cases added the "viewed as a whole" language to the analysis. *See, e.g., Ferreira v. Honolulu R.T. & L. Co.*, 16 Haw. 615, 622 (1905). The Hawai'i Supreme Court neatly summed the "viewed as a whole" concept in 1934:

In determining the sufficiency of a particular instruction, or part of a charge, it is not to be considered apart from its context, or the rest of the charge. Both in civil and criminal cases the instruction of the court must be read together as one connected whole, to ascertain whether they correctly declare the law. The omissions or inaccu-

---

**22.** We reiterate that prejudgment interest can be awarded when the issuance of judgment is greatly delayed for any reason. Of course, purposeful delay (or dilatory tactics) by the non-moving party, if it causes a substantial delay in the proceedings, falls within the ambit of "any reason" under the statute. By the same token, a trial court can and probably should deny prejudgment interest if the moving party was responsible for the delay. Still, the trial court is vested with the discretion to award prejudgment interest whether or not dilatory tactics are shown by either party, so long as the issuance of judgment was greatly delayed. *Leibert v. Finance Factors, Ltd.*, 71 Haw. 285, 293, 788 P.2d 833, 838 (1990) ("the purpose of the statute was to allow the court to designate the commencement date of interest in order to correct the injustice when a

judgment is delayed for a long period of time for any reason, including litigation delays").

**23.** The relevant portion of this statute provides: When there is no express written contract fixing a different rate of interest, interest shall be allowed at the rate of ten per cent a year, except that, with respect to obligations of the State, interest shall be allowed at the prime rate for each calendar quarter but in no event shall exceed ten per cent a year. . . .
Hawai'i Revised Statutes (HRS) § 478–2 (1993). The trial court arrived at a 6.5 percent interest rate by averaging Treasury and CD rates from 1986 through 1992. But given that there was no "express written contract fixing a different rate of interest," and the fact that this case did not involve "obligations of the State," the trial court's computation was incorrect.

racies of one instruction may be cured by the contents of the other instructions, or some of them, and if, when the instructions of the court are considered as a whole, they correctly state the law and are not inconsistent or misleading, the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal.

*Ciacci v. Woolley*, 33 Haw. 247, 261–62 (1934) (citation omitted). Contemporary cases using the "viewed as a whole" concept now explain that the analysis must include a determination of whether the instructions as a whole are prejudicially insufficient, erroneous, inconsistent, or misleading. *See, e.g., Craft*, 78 Hawai'i at 302, 893 P.2d at 153 ("When jury instructions, or the omission thereof, are at issue on appeal, 'the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading.' ") (citations omitted); *State v. Lincoln*, 3 Haw.App. 107, 117, 643 P.2d 807, 815 (1982) ("The issue is not whether the refused instruction is a correct statement. The issue is whether, when they are read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.") (citations omitted).

The propriety of a refused instruction under the "viewed as a whole" concept requires a *de novo* review. The first step in this *de novo* review is to assess whether the refused instruction is a correct statement of the law. *See Richardson*, 76 Hawai'i at 504, 880 P.2d at 179 ("Whether a jury instruction properly states the law is a question that this court will review *de novo.*") (citing *S. Utsunomiya Enters., Inc. v. Moomuku Country Club*, 75 Haw. 480, 506, 866 P.2d 951, 965 (1994)). A trial court's refusal of an instruction that improperly states the law does not, as a matter of law, result in prejudice to the party making the request. *Agee v. Kahului Trucking & Storage, Inc.*, 67 Haw. 365, 369, 688 P.2d 256, 259 (1984) (quoting *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978) (citations omitted)).

Once it is determined that the instruction is a correct statement of the law, the second step is to view the entire jury charge as a connected whole and determine whether the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. To constitute reversible error under this analysis, it is not enough that a party's refused instruction states a correct, relevant rule of law; rather, the instructions, when viewed as a whole, must satisfy one of the four foregoing errors and the refusal must prejudice a substantial right of the party making the request. *See In. re Estate of Lorenzo*, 61 Haw. 236, 244, 602 P.2d 521, 528 (1979) ("The question on review of instructions is not whether they were technically correct but whether the appellant could have suffered prejudice on their account."). Nevertheless, the trial court's refusal of a relevant instruction that correctly states the law will render the instructions as a whole prejudicially insufficient if the principle is not adequately and fully covered by other instructions. *Agee*, 67 Haw. at 369, 688 P.2d at 259 (quoting *Sherry v. Asing*, 56 Haw. 135, 144, 531 P.2d 648, 655 (1975) (citations omitted)); *In re Nakuapa*, 3 Haw. at 402. After applying the preceding two-step analysis, we then determine whether the trial court's refusal of a requested instruction was right or wrong.

Conversely, the second line of cases addressing the standard of review for refused instructions uses an abuse of discretion analysis. The genesis of this standard is, as far as we can tell, the Hawai'i Supreme Court's decision in *Johnson v. Tsukahara*, 51 Haw. 28, 448 P.2d 822 (1968). Jury instructions were not the central issue in *Johnson*. The court merely touched on the issue as guidance for a new trial. In so doing, however, the court enunciated the abuse of discretion standard of review for the refusal of repetitious instructions: "The objection that a proposed instruction is already covered by other instructions raises the question of permissibility of repetitious instructions. Repetition of the same proposition in several instructions is generally a matter within the sound discretion of the trial court and is not reversible error." *Id.* at 33, 448 P.2d at 825 (citing

*Wood v. Hulsey,* 271 S.W.2d 218 (Mo.Ct.App. 1954)).

One year later, the supreme court added flesh to the bones of the *Johnson* decision. In *Barretto v. Akau,* 51 Haw. 383, 463 P.2d 917 (1969), which partly involved a clash over a damages instruction, the supreme court highlighted the necessity of trial court discretion when dealing with repetitious instructions and the inherent problems that arise when reviewing the trial court's exercise of its discretion:

> In *Johnson* . . . this court said that "[r]epetition of the same proposition in several instructions is generally a matter within the sound discretion of the trial court and is not reversible error." In this case we are faced with the task of putting some flesh on the bones of judicial "discretion" in this area. The reason for limiting repetitious instructions is not, as the defendant contends, that the issue of damages will otherwise be over-emphasized. Damages were the principal issue in this case. The vice to be controlled here is the misleading of the jury resulting from the cumulative effect of repetitious instructions, however relevant and correct, because of the great respect the jury has for the judge and his [or her] views . . . .
>
> The mere numerical redundancy of instructions is not the operative test for prejudice. Each case must be considered separately and in light of its own facts, keeping in mind the point that a fair and complete single instruction on each issue is most desirable. Based on that rule the trial court did not abuse its discretion in giving separate instructions with respect to the separate injuries to [the appellee]. She was entitled to separate consideration as to each of these injuries, any one of which might have supported an action for damages, although it would have been preferable to combine the instructions and eliminate repetition whenever possible.
>
> On the other hand, the instructions dealing with the general law of damages told the jury in varying degrees of detail and in different language six times that they were to compensate plaintiffs for all damages which were the direct and proximate result of the accident. Beyond informing the jury of the law of damages, in our view, the multiple instructions came precariously close to upsetting the climate of reason which must prevail in a jury trial and gave the outward impression that perhaps the trial judge had formed an opinion in this case as to the preferred result. For that reason, on retrial such instructions should be corrected to give the jury fewer and yet comprehensive instructions on the general law of damages.
>
> We are aware of opinions by this court stating that it is error for the trial court to refuse to give an instruction which correctly states the law and which is not adequately covered by other instructions . . . . Further, . . . this court [has] stated that it is generally considered error to refuse to give a requested instruction on a given point which is accurate and applicable though the point may have been unequivocally covered by a general instruction.
>
> While these cases can be viewed as generating some pressure on the trial judge to be generous with the instructions given in order to avoid reversal, the instant case approaches the other end of the spectrum where cumulative instructions become prejudicial. The cautionary statement of [a recent supreme court dissenting opinion] would appear to be applicable here. The fact that more specific instructions are offered does not require the trial court to accept them and reject slightly more general instructions or give cumulative instructions on the same point . . . .
>
> We do not want a trial judge to feel whipsawed by the obligation to give sufficient instructions and the opposing requirement not to give cumulative instructions. There is surely plenty of room between instructions which are cumulative for the trial judge to perform comfortably his [or her] function of adequately informing the jury of the relevant law. If any policy is to be preferred, it is that allowing adequate and thorough instructions to be given. Only in the rarest cases will cumulative instructions be the basis for a new trial.

*Id.* at 397–99, 463 P.2d at 925–26 (internal quotation marks and citations omitted). Simply put, this line of cases holds that the trial court should be given the discretion to refuse repetitious instructions while simultaneously giving a fair and complete jury charge.

The most oft-cited case on the abuse of discretion standard of review is *Tittle v. Hurlbutt*, 53 Haw. 526, 497 P.2d 1354 (1972). *Tittle* also involved a trial court's refusal of a requested instruction. And although the case does not contain an in-depth analysis, the court did adopt and apply the abuse of discretion standard of review: [24]

> The function served by jury instructions is to inform the jury of the law applicable to the current case. The boundaries of the trial judge's discretion in performing this function are defined by the obligation to give sufficient instructions and the opposing imperative against cumulative instructions. . . . The trial judge does not exceed the limits of his [or her] discretion by reason of his [or her] refusal of a requested instruction which is substantially covered by other instructions, even when the refused instruction is a correct statement of the law.

*Id.* at 531, 497 P.2d at 1357 (citations omitted).

More recent decisions in this line of cases have, with little discussion, used the abuse of discretion standard of review outside the context of cumulative or repetitive instructions. *See, e.g., Create 21 Chuo, Inc. v. Southwest Slopes, Inc.*, 81 Hawai'i 512, 525, 918 P.2d 1168, 1181 (App.1996); *Richardson*, 76 Hawai'i at 504, 880 P.2d at 179.

 Because of the difficulty involved with trying to apply the abuse of discretion standard of review in the instant case, which does not involve cumulative or repetitive instructions, and because it is virtually impossible to review the refusal of an instruction in

this context without some type of *de novo* review, we choose to follow the "viewed as a whole" line of cases when analyzing the issue of Dr. McCurdy's refused instruction.[25] Thus, we review the informed consent instruction that was given and the standard of care instruction that was refused *de novo* under the right/wrong standard to determine whether they are correct statements of the law. Secondly, we further review the refusal of Dr. McCurdy's instruction on the standard of care *de novo* in light of all the given instructions as a whole. In this vein, we assess the instructions as a connected whole to determine whether the essence of the standard of care instruction was sufficiently and substantially covered by other instructions and whether the instructions were rendered prejudicially insufficient, erroneous, inconsistent, or misleading by the trial court's refusal. *See Craft*, 78 Hawai'i at 303, 893 P.2d at 138 (quoting *State v. Pinero*, 75 Haw. 282, 292, 859 P.2d 1369, 1374 (1993) (" 'Both in civil and in criminal cases the instructions of the court must be read together as one connected whole, to ascertain whether they correctly declare the law.' ")).

### 2. *The Consent Form Instruction Was Proper.*

Dr. McCurdy contends that it was error for the trial court to instruct the jury that Ditto had no duty to read the consent form. We disagree.

 The trial court instructed the jury that Dr. McCurdy had a duty to inform Ditto of, among other things, the risks involved in her procedure and alternative forms of treatment:

> Before performing surgery or providing any other treatment to plaintiff Janie Ditto, Dr. McCurdy had the affirmative duty to inform her of the following in timely manner [sic]:.

---

24. It is worthy to note that the *Tittle* case cites a number of cases to support it's conclusion that the abuse of discretion standard of review should be used when addressing a trial court's refusal of a requested instruction. With the exception of *Barretto v. Akau*, 51 Haw. 383, 463 P.2d 917 (1969), however, none of the cases cited by *Tittle* explicitly use or discuss the abuse of discretion

standard. *Tittle v. Hurlbutt*, 53 Haw. 526, 531, 497 P.2d 1354, 1357 (1972).

25. Interestingly, Dr. McCurdy cites the "viewed as a whole" analysis as the appropriate standard of review, while Ditto cites the abuse of discretion standard.

1, the condition being treated;

2, the nature and character of the proposed treatment or surgical procedure;

3, the anticipated result;

4, the recognized possible alternative forms of treatment; and

5, the recognized possible serious risks ... [or] complications....

The court further instructed the jury that Ditto had no duty to read the consent form:

A patient has no duty to read a standard consent form before signing it, nor does a patient have a duty to inquire about the risks and complications of medical procedures. A signed consent form is no substitute for the required disclosure by a physician, and a physician does not fulfill his duty of disclosure merely by having the patient sign a patient consent form. The patient is not contributorily negligent for failing to read a consent form.[26]

▮▮▮▮ "The doctrine of informed consent imposes on physicians and surgeons the duty to fully disclose to a patient 'the type of risks and alternatives' to a proposed treatment or surgery." *Keomaka v. Zakaib*, 8 Haw.App. 518, 523, 811 P.2d 478, 482 (citation omitted), *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1991):

The informed consent doctrine is based on principles of individual autonomy, and specifically on the premise that every person has the right to determine what shall be done to his [or her] own body. Surgeons and other doctors are thus required to permit the patient ... to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 32, at 190 (5th ed.1984); *see generally* Ranelle A. Leier,

Case Note, *Torts: Defining the Duty Imposed on Physicians by the Doctrine of Informed Consent K.A.C. v. Benson*, 22 Wm. Mitchell L.Rev. 149 (1996) (discussing the historical development and contemporary trends of the doctrine of informed consent). This is an affirmative duty of disclosure on the part of physicians and surgeons and it requires an affirmative act. *Keomaka*, 8 Haw.App. at 532, 811 P.2d at 486 (citation omitted). *See Carr v. Strode*, 79 Hawai'i 475, 904 P.2d 489 (1995).

▮▮▮▮ Additionally, there are restrictions on the method a physician or surgeon can use to secure the informed consent of his or her patient. For example, "a physician may not fulfill his [or her] affirmative duty of timely and adequate disclosure by merely having the patient sign a [pre-]printed informed consent form. A signed consent form is not a substitute for the required disclosure by a physician." *Keomaka*, 8 Haw.App. at 532, 811 P.2d at 486.

In the instant case, Ditto's uncontradicted testimony establishes that Ditto had a fourth grade education and could not read English when she signed the consent form on November 3, 1986. In addition, Ditto testified that Dr. McCurdy did not explain alternative procedures or discuss possible complications. She also claimed that he did not take any affirmative steps to ensure that Ditto could understand any of the contents before she signed the consent form. And under Dr. McCurdy's interpretation of the doctrine of informed consent, a patient, even one who is illiterate, has a duty to read a written consent form and speak up if he or she does not understand the consent form's contents. In essence, Dr. McCurdy argues that a signature (even from one who is illiterate) is sufficient to satisfy the doctrine of informed consent.[27] We disagree.

---

**26.** The legislature has replaced the doctrine of contributory negligence with a modified comparative negligence statute. HRS § 663–31 (1993).

**27.** The following exchange between Dr. McCurdy and Ditto's counsel captures the essence of Dr. McCurdy's views on the doctrine of informed consent, and provides the rationale for the trial court's sage decision to give the consent form instruction:

[Counsel] Did you make any attempts to determine whether or not at the time in 1986, Ms. Ditto was literate in English?
[Dr. McCurdy] I counseled her and spoke in English, and it was apparent to me that she was literate in spoken English.
[Counsel] Could I ask for a response?
[Dr. McCurdy] She was literate in spoken English, sufficient to my satisfaction.
[Counsel] Doctor, I understand what you're saying, but the question to you was, did you

■ The trial court's instruction on informed consent was firmly grounded on the principles of our holding in *Keomaka*. We now reaffirm *Keomaka* and hold that a consent form is no substitute for a physicians's affirmative duty to inform his or her patient. *See Craft*, 78 Hawai'i at 303, 893 P.2d at 154 (endorsing *Keomaka* rule that contributory negligence is inapplicable to doctrine of informed consent).[28] This is so in all cases involving proposed medical treatment, but is particularly vital in cases where a patient may not be able to fully comprehend the written information in the consent form. It would pervert the law of informed consent to allow a physician to discharge his or her affirmative duty by merely "securing a signature—even that of a drowsy, drugged, ... confused [or uneducated] patient on an abstruse, jargon-ridden, and largely unintelligible preprinted consent form[.]" *Keomaka*, 8 Haw.App. at 533, 811 P.2d at 487 (citation omitted). While the signature of a competent, literate adult can become a part of the analysis involving whether a physician has satisfied his or her affirmative duty, we hold that a signature, standing alone, cannot be equated with any alleged comparative negligence on the part of the patient.

We have examined the consent form instruction as a whole and conclude that it is a correct statement of the law and, consequently, did not in any way prejudice Dr. McCurdy.

### 3. *The Trial Court's Refusal of Dr. McCurdy's Standard of Care Instruction Was Proper.*

Dr. McCurdy offered an instruction requiring, among other things, the standard of care to be determined "only from the opinions of the physicians." He contends that the trial court committed error by refusing the instruction because no other instruction informed the jury that the plaintiff had the burden of establishing the standard of care by expert medical testimony. We disagree.

■ Dr. McCurdy's refused instruction explains that the standard of care must be determined by expert witnesses, and that the experts' testimony should be judged by the same credibility guidelines applied to all witnesses generally:

> You must determine the standard of professional learning, skill, and care required of the Defendants only from the opinions of the physicians, including the Defendants who have testified as expert witnesses as to such standard.

> You should consider each such opinion and should weigh the qualifications of the witnesses and the reasons given for his opinion. Give each opinion the weight to which you deem entitled.

> You must resolve any conflict in the testimony of the witnesses by weighing each of the opinions expressed against the

make any attempts to ascertain whether she could read English?
[Dr. McCurdy] No.
[Counsel] Did you have any of your staff members make any attempt to ascertain whether your patient, before signing the informed consent form, could read it?
[Dr. McCurdy] No, they are instructed to ask questions before they sign, if they have any questions. I would assume that if somebody could not read the form, they would want it explained to them, and that is the duty of my medical assistants, and me, *if the patient so requests*.
. . . .
[Counsel] And am I correct in understanding that neither you or [sic] anyone on your staff, as far as you know, made any attempt to ascertain whether my client could read the consent form before you put it in front of her and asked her to sign it, so you could do the operation?

[Dr. McCurdy] The directions given to patients are to make sure they understand the consent form before they sign it. *If they can't read it or have questions, then it is their duty to ask the head medical assistant or the doctor.*
[Counsel] What is the duty of your staff?
[Dr. McCurdy] The duty is to be there to ascertain whether or not the patient understands it.
[Counsel] That is weather [sic] they can read it?
[Dr. McCurdy] Whether or not they can understand it.
[Counsel] Did anyone make that attempt to determine whether Ms. Ditto could understand those concepts that you were putting in front of her on November 3rd?
[Dr. McCurdy] You will have to ask the assistant. I assume so. I will say that, *that is their responsibility and duty.*
(Emphases added.)

28. *See supra* note 26.

others, taking into consideration the reasons given for the opinion, the facts relied upon by the witness, and the relative credibility, special knowledge, skill, experience, training, and education of the witness.

 "It is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving [generally] through expert medical testimony." *Craft*, 78 Hawai'i at 298, 893 P.2d at 149 (citing *Nishi v. Hartwell*, 52 Haw. 188, 195, 473 P.2d 116, 121 (1970) (citations omitted), *overruled by Carr*, 79 Hawai'i at 475, 904 P.2d at 489)); *accord Carr*, 79 Hawai'i at 485–86, 904 P.2d at 499–500. This requirement differs from an ordinary negligence case " 'because a jury generally lacks the requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert.' " *Id.* (quoting *Rosenberg v. Cahill*, 99 N.J. 318, 325, 492 A.2d 371, 374 (1985) (citations omitted)) (internal quotation marks omitted).[29]

Dr. McCurdy argues that because the preceding instruction was refused "[t]he jury was not told that a medical malpractice action 'imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony.' " We disagree. The common law in the vast majority of jurisdictions, including our own, simply holds, as we previously stated, that expert testimony is generally a necessity to establish the standard of care and medical negligence. *See, e.g., Potter v. H. Kern Wisner, M.D., P.C.*, 170 Ariz. 331, 823 P.2d 1339, 1341 (App.1991); *Craft*, 78 Hawai'i at 298, 893 P.2d at 149; *Sharples v. Roberts*, 249 Kan. 286, 816 P.2d 390, 397–98 (1991); *Falcon v. Cheung*, 257 Mont. 296, 848 P.2d 1050, 1055 (1993); *King v. Searle Pharmaceuticals, Inc.*, 832 P.2d 858, 862 (Utah 1992); *Guile v. Ballard Community Hosp.*, 70 Wash.App. 18, 851 P.2d

689, 693, *review denied*, 122 Wash.2d 1010, 863 P.2d 72 (1993).

As a threshold matter, we conclude that Dr. McCurdy's refused instruction, though somewhat unclear, is an accurate statement of the law. The standard of care must indeed generally be determined by expert medical testimony. Additionally, the jury is the sole judge of factual issues involving the credibility of witnesses. Nevertheless, the first sentence of Dr. McCurdy's requested instruction, which is lifted directly from California's Book of Approved Jury Instructions (BAJI), contains two confusing and potentially misleading sections. The first section explains that the standard of care must be determined "only from the opinions of the physicians...." This sentence, considered in isolation—as it can because of the comma following the word "physicians"—implies that the jury can rely on the opinions of physicians not qualified as experts to determine the standard of care. The second section states that the standard must also be determined by "Defendants who have testified as expert witnesses as to such standard." This section implies that only those defendant witnesses who have testified as experts should be relied on, juxtaposed to the plaintiff physicians who may not necessarily be experts. We attribute the arcane features of Dr. McCurdy's requested instruction to poor drafting. Nonetheless, we conclude that the portion of the instruction on the standard of care (assuming the grammatical dissonance is understood) is correct.

 Having determined that Dr. McCurdy's refused instruction is a correct statement of the law, we now analyze the relevant jury instructions as a connected whole to determine whether the instructions were prejudicially insufficient, erroneous, inconsistent, or misleading. The trial court's instruction number twenty-two reads: "A physician has a duty to possess and exercise

---

29. There is a "common knowledge" exception to the expert medical testimony requirement. If the alleged negligent act is within the common understanding of an average person (for instance, amputating the wrong limb), expert testimony is not required and the case then becomes an ordinary negligence case. *Craft v. Peebles*, 78 Hawai'i 287, 298, 893 P.2d 138, 149 (1995). "In

such a case the jury itself is allowed 'to supply the applicable standard of care and thus obviate the necessity for expert testimony relative thereto.' " *Rosenberg v. Cahill*, 99 N.J. 318, 492 A.2d 371, 374 (1985) (quoting *Sanzari v. Rosenfeld*, 34 N.J. 128, 167 A.2d 625 (1961)). The common knowledge exception is not at issue here.

the skill, care, and knowledge commonly possessed and exercised by members of his profession. The failure to meet this standard constitutes negligence on the part of the physician." Instruction number twenty-seven explains, in part: "The burden of proving that the defendants were negligent and that their negligence was a legal cause of the injury or damage is on the plaintiff." The court further instructed the jury about the parameters of expert testimony in instruction number seventeen:

> Certain testimony has been given in this case by experts; experts are persons who qualify because of knowledge, skill, experience, training, and/or education, and thus, possess specialized knowledge on matters not commonly known to the general public. The law permits such persons to give their opinions regarding such matters. The testimony of experts is to be considered like any other testimony and is to be tried by the same tests, and should receive such weight and credit as the jury deems it is entitled to, when viewed in connection with all other facts and circumstances. Expert testimony is given to assist you in your evaluation of the facts in this case. The weight and value to be given to such testimony, if any, are for you, the jury to decide.[30]

In addition, the trial court told the jury in instruction number three that it was only to consider the evidence produced at trial, including the testimony of the witnesses:

> In arriving at your verdict, you are to consider only the evidence which has been presented to you in this case. You should consider all of the evidence in the case, without regard to which party produced it. The evidence consists of the sworn testimony of the witnesses and all exhibits which have been received in evidence.
>
> However, in saying that you must confine your consideration only to the evidence which has been presented to you in this case, I do not mean to say that you are required to set aside your own observations and experiences in the affairs of life. You have the right to consider the evidence in the light of your common sense and you may make such reasonable inferences from facts which you find have been proved as seem justified in the light of your own experience.

Hence, the jury was precluded from relying on extraneous matters (except for common sense) or, for instance, establishing its own standard of care based on evidence, including testimony, not presented during the trial.

If the jury was compelled to consider only the evidence and testimony produced at trial (instruction number three), and told that Ditto had the burden of proving that Dr. McCurdy was negligent (instruction number twenty-seven), and that negligence was the failure to possess and exercise the skill, care, and knowledge commonly possessed and exercised by members of the profession (instruction number twenty-two), then the jury was required to determine the standard of care and medical negligence only from the testimony of witnesses, including experts (instruction number seventeen) addressing those issues. Ditto's case-in-chief consisted of four witnesses who were, in order of appearance: Dr. Lassa, Ditto, Kathy Kokouchi, and Dr. Sandra Paulsen. Ditto's testimony was purely narrative and informational. She did not offer opinions about the standard of care or Dr. McCurdy's alleged breach of the standard of care. Kathy Kokouchi was an executive secretary with the State Department of Commerce and Consumer Affairs Professional and Vocational Licensing Division. She was called solely to testify that Scarpiova was not listed as a registered nurse licensed to practice in the State of Hawai'i. Dr. Paulsen, a clinical psychologist,

---

**30.** Instruction number seventeen is nearly identical to the second and third paragraphs of Dr. McCurdy's refused instruction. Moreover, instruction number seventeen did not, as the dissent states, tell the jury that "expert testimony was like any other evidence and could be disregarded if the jury did not believe that such evidence was entitled to any weight and credit." Dissenting Opinion at 130, 947 P.2d at 997–998. The jury was told that experts have special knowledge and skill and to weigh the credibility of experts and the weight to be given the experts' testimony by the same credibility guidelines applied to non-expert witnesses "when viewed in connection with all other facts and circumstances." This is certainly a correct statement of the law. The jury is free to determine the credibility of the witnesses at trial, including expert witnesses.

testified about Ditto's mental condition, including depression and post traumatic stress syndrome; Dr. Paulsen did not offer opinions about the standard of care or medical negligence. *See supra* note 7.

On the other hand, Dr. Lassa testified extensively and almost exclusively about the standard of care for informed consent and breast augmentation, and Dr. McCurdy's alleged failure to satisfy the standard of care. Thus, for the jury to find that Ditto proved that Dr. McCurdy was negligent, while observing instruction number twenty-seven, it had to rely on the testimony of Dr. Lassa. His testimony was the only testimony offered by Ditto on the standard of care.

Dr. Lassa spent a great deal of time testifying about virtually all aspects of Dr. McCurdy's treatment of Ditto. After being qualified as an expert in the field of breast augmentation surgery, he rendered, as the following colloquies between he and Ditto's counsel reveal, a substantial amount of testimony about the standard of care and medical negligence:

[Counsel] Okay. Doctor, have you reviewed any materials pertaining to the care and treatment that was provided to Janie Ditto by Dr. McCurdy and his office?

[Dr. Lassa] I have reviewed [Dr. McCurdy's] records, transcripts of them as well that were understandable, several depositions, [and] transcripts of Mrs. Ditto's experience with the Army Medical system from about 1980 through her present—the present time. I think that's it.

[Counsel] Okay. And have you formed any opinions as to whether or not Dr. McCurdy's care and treatment of Ms. Ditto met the applicable standard of care?

[Dr. Lassa] Yes, I have.

[Counsel] And do you hold that opinion to a reasonable degree of medical probability?

[Dr. Lassa] Yes, I do.

[Counsel] And what is that opinion?

[Dr. Lassa] I don't believe her care was up to appropriate standards.

[Counsel] Okay. And could you explain what aspects of care you believe fell below the standard?

[Dr. Lassa] Starting at the beginning, I don't believe that she was actually informed that Dr. McCurdy is a[n] ear, nose and throat surgeon as opposed to a plastic surgeon.

Her statements reveal that she, at the time of surgery at least had a very poor understanding of reading English and that, in fact, she had not understood the operative permit in any way that was—that she signed. That she had not—her statements were that she had not been advised of the potential risks and/or complications of surgery, including the major complications that should be stressed, including bleeding, infection, damage to adjacent structures and unsatisfactory result.

. . . .

It's below the standard of care to operate on a patient without them being given fully informed consent [sic].

I don't believe the—there's a possibility that the intraoperative care on the first day of her surgery was inappropriate in that she had surgery in the morning between about six and 7:30, then had a first hematoma, that is she had bleeding within the right dissection of her breast where the breast prosthesis was placed, and she had bleeding to the point that the wound had to be opened and the bleeding taken out of the pocket where breast prosthesis was.

In reviewing Dr. McCurdy's operating room notes, including the anesthesia notes, it appears that this was probably performed in the recovery room without adequate aseptic, that is sterile, technique, although I can't be sure because later in the day a second hematoma occurred in the same breast and there is anesthesia notation that the patient was given a general anesthetic again around 5 or 6 o'clock to remove the second hematoma under sterile conditions in the operating room. If the first one was removed under non-sterile conditions, that was below the standard of care.

[Counsel] Okay.

[Dr. Lassa] Subsequently she came into the office with blood oozing out the stitch

lines, according to her statements, for over 10 or 12 days. And the appropriate treatment for that, if it does occur, is to, on the same day that it's identified, take the patient back to the operating room, re-explore the wound to take out all of the bleeding or clots that are oozing through the wound, because that's a two-way street. It's like—it's like a sponge. If you squeeze a sponge out dry and let it go, it'll absorb things. And if she squeezes out her—the blood out of her breast, in fact, as she was told to do by Dr. McCurdy, and let's go, sucks things [sic] on the body surface back in, which is basically germs that can cause an infection.

So I believe that was below the standard of care throughout at least several weeks.

. . . .

[Counsel] Doctor, before we proceed, all of your testimony here today, other than—unless you tell us otherwise, we'd like to relate to the standard of care and what was the standard of care and what you did for the time period 1986, 1987, rather than—and if it's changed in any way, you don't need—what we're concerned about is not today but back then [sic].

[Dr. Lassa] Correct.

. . . .

[Counsel] And what is the standard of care with regard to what a physician—surgeon performing a breast augmentation does with—if he or she identifies a ruptured blood vessel?

[Dr. Lassa] Stop the blood vessel.

[Counsel] Okay.

[Dr. Lassa] That is, we call it hemostasis, but stop the bleeding at that point.

[Counsel] Is it part of the standard of care to continue to observe the operative site to determine whether or not those blood vessels are bleeding? In other words, there is a rupture?

[Dr. Lassa] During the duration of the procedure, yes, of course.

[Counsel] And is there any standard of care with regard to checking before closing the patients up?

[Dr. Lassa] Well, the standard of care is to check it before we put in the prosthesis,

actually during dissection. That is[,] during the cutting everything apart and identifying the plane of the placement of the prosthesis, we try to stop every blood vessel that's encountered that is cut or pulled open and stop it at that point.

Occasionally there is bleeding after the dissection is totally completed and then we have to try and identify that and make it stop at that point. But once the implant is placed, there should be a totally dry, that is[,] bloodless, field and then closure is performed.

. . . .

[Counsel] Doctor, we've asked the question. I wonder if you could answer it. Is it below the standard of care to allow for a physician—to allow a[sic] non-physician office personnel, even at the physician's assistant level, which is, I take it, the highest level, to perform suturing on a patient who has an incision opening up following an augmentation surgery?

[Dr. Lassa] In—in his immediate presence?

[Counsel] No, assuming that the doctor is not in the immediate state.

[Dr. Lassa] No, that's below the standard of care.

. . . .

[Counsel] Doctor, you [previously] testified ... that hematomas were a recognized complication of breast augmentation surgery. That being the case could you explain to the jurors why you believe that the hematomas that developed in Miss Ditto the [sic] result of Dr. McCurdy's deviation from the standard of care rather than from some other cause, non-negligent cause?

. . . .

[Dr. Lassa] ... In this case I would state that there is evidence of lack of previous appropriate training to hold himself out as a breast surgeon, a plastic surgeon doing breast surgery. Secondly, the bleeding that did occur was not managed appropriately and the lack of appropriate management is definitely below the standard of care.

. . . .

[Counsel] Doctor, in this case are you familiar with the standard of care as to whether or not a physician who is managing a postoperative breast augmentation patient is required to be able to identify an infection in the patient's breast postoperatively when one exists? Are you familiar with the standard of care on that?

[Dr. Lassa] That's a difficult question to answer. I'm familiar with the standard of care—the diagnosis of an infection in a breast that has no other complication; that is, that heals well, that doesn't have blood draining out of it, is difficult because there is [sic] some germs which are very unusual and rare that can infect the breast.

Conversely, the standard of care with respect to managing a breast with blood draining out of it after an augmentation of the breast is that you immediately take the patient to the operating room. Immediately or as soon as is possible take the patient to the operating room, evacuate; that is, remove the bleeding. Most people would irrigate the wound with antibiotics and give the patient antibiotics before, during, and after surgery in an operating room under sterile conditions.

. . . .

[Counsel] Doctor, based on your review of the records in this case and Dr. McCurdy's departure from the standard of care do you have an opinion as to whether that deviation from the standard of care was a cause of any injury or damage to Miss Ditto?

[Dr. Lassa] Yes.

[Counsel] And could you tell us what that opinion is.

[Dr. Lassa] I believe for all the reasons that I stated before, and can restate if necessary, that the infection and subsequent surgeries were a direct result of lack of appropriate treatment of her initial surgical experience due to the fact that an infection occurred which could have been— could most likely have been avoided by immediate return to the operating room and under sterile conditions removal of the hematoma and—period.

Dr. Lassa clearly offered extensive expert medical testimony on both the standard of care and medical negligence as they directly related to Dr. McCurdy's treatment of Ditto. Additionally, Dr. McCurdy testified in his own behalf, and his testimony was buttressed by Dr. Howes, the only expert witness called on behalf of the defense to testify about the standard of care. Dr. Howes' testimony, in sum and substance, refuted the testimony of Dr. Lassa in every material respect. As a result, the jury in this case had "only the opinions of the physicians, including the Defendants who ... testified as expert witnesses" to rely on when determining the standard of care. Hence, Dr. McCurdy's requested instruction was superfluous.

Conversely, the Hawai'i Supreme Court's decision in *Craft v. Peebles*, 78 Hawai'i 287, 893 P.2d 138 (1995), provides a salient example of a case where both expert testimony and an instruction on expert testimony would be indispensable. *Craft* was a medical malpractice case filed by Teena Craft (Teena) against a physician and the manufacturer of silicone breast implants. Teena had silicone implants inserted by Dr. Peebles. Following the procedure, she noticed that her breasts began to harden. Dr. Peebles subsequently performed a closed capsulotomy. During the procedure, both Teena and Dr. Peebles heard a "pop" that was either a rupture of the muscle tissue or a rupture of the silicone implant. Although Teena was later diagnosed with and treated for a ruptured implant, Dr. Peebles was unsure whether the closed capsulotomy caused the implant to rupture. Teena then sued Dr. Peebles for negligence and lack of informed consent, and sued the manufacturer of the implants for negligence, strict products liability, and breach of warranty.

Prior to trial, Dr. Peebles filed a motion for summary judgment on Teena's negligence claim on the ground that she failed to provide expert medical testimony on the standard of care. Teena responded by asserting that the common knowledge exception applied because the package insert from the manufacturer provided a standard of care that could be commonly understood by the average person, and thus expert testimony

was unnecessary.[31] The trial court disagreed and granted Dr. Peebles' motion and Teena appealed.

In affirming the trial court's ruling on Dr. Peebles' motion for summary judgment, the supreme court agreed with the line of authority that considers package inserts from the manufacturer relevant evidence, but not the sole indicator of the standard of care: "[w]e . . . hold that a manufacturer's package insert, in and of itself, may not establish the relevant standard of care in a medical negligence action. The inserts may be considered by the fact finder along with expert testimony, but may not alone define the standard of care." *Craft*, 78 Hawai'i at 300, 893 P.2d at 151. The supreme court then offered two reasons for its decision in Dr. Peebles' favor. First, Teena "did not present expert medical testimony in conjunction with [the manufacturer's] inserts at summary judgment." *Id.* at 301, 893 P.2d at 152. Second, at trial, Dr. Peebles offered deposition testimony from an expert witness with his motion for summary judgment that the expert had performed closed capsulotomy procedures in the past and was still performing them at the time of his deposition. *Id.* Dr. Peebles' independent expert witness also testified that he too performed the procedure in spite of the package insert's warning. *Id.* The supreme court concluded by explaining that "[t]he fact that physicians . . . performed closed capsulotomies, despite the language provided in the insert, clearly explains why the insert alone should not be viewed as establishing the standard of care." *Id.*

The facts of the *Craft* case and the supreme court's decision emphasize that the hallmark of this area of the law is that in most medical malpractice cases the plaintiff must offer proof of the standard of care by expert medical testimony. Additionally, and more instructive for our purposes, the case is an example of a potential factual scenario where an instruction on expert testimony and the standard of care would be required. If Craft's negligence claim against Dr. Peebles had proceeded to trial, the package insert would have, as the supreme court held, been allowed as evidence for the jury to consider. *Id.* at 300, 893 P.2d at 151. There would have been, however, evidence on the standard of care other than the testimony of expert witnesses and thus an instruction on expert testimony and the standard of care would have been necessary. No such problems are evident in our case.

██ Despite our conclusion that there may indeed be cases where an instruction similar to Dr. McCurdy's requested instruction would be required (albeit more artfully written), we are reluctant to impose a per se rule on trial courts that a specific instruction be given.[32] We believe it unwise to shackle trial courts with a rigid instruction that may or may not suit each particular case. The more prudent approach, in our view, is to let the decision on an appropriate instruction ride with the specific facts of each case. Each challenge of a trial court's refused instruction should then be analyzed using our current common law governing both refused instructions and the necessity, or lack thereof, of expert medical testimony.

In sum, we hold that the trial court's refusal of Dr. McCurdy's requested instruction on the standard of care was correct because: (1) Dr. McCurdy did not request an instruction stating that the plaintiff had the burden of proving the standard of care by expert medical testimony, but merely offered an instruction stating that the standard of care must be determined only from the opinions of the physicians who testified as experts; (2) instructions three, seventeen, twenty-two, and

---

**31.** The manufacturer's package insert provided a specific warning about the potential complications that could arise when performing a closed capsulotomy and specifically recommended the procedure not be performed:

> The surgeon should be aware that the treatment of capsular contracture by manual compression of the breast may cause the saline and/or gel envelopes to rupture with attendant extravasation being probable. [The manufacturer] cannot guarantee the integrity of the

implant in that situation and does not recommend this procedure.

*Craft*, 78 Hawai'i at 300, 893 P.2d at 150.

**32.** On the other hand, we strongly recommend that, as a matter of course, the jury be instructed that "the plaintiff has the burden of proving both the standard of care and medical negligence by expert medical testimony," or words to that effect.

twenty-seven, when considered as a connected whole, adequately embodied the soul of Dr. McCurdy's requested instruction; (3) Ditto satisfied her burden of proving the standard of care and medical negligence by presenting the expert testimony of Dr. Lassa; (4) there was no danger of prejudice to Dr. McCurdy because Dr. Lassa was the plaintiff's only expert witness who testified about the standard of care and medical negligence, thereby diffusing the type of confusion present in *Craft;* in other words, there was no other evidence relating to the standard of care offered by Ditto; and (5) in view of the foregoing, the instructions as a whole were not rendered prejudicially insufficient, erroneous, inconsistent, or misleading.

Therefore, we hold, after reviewing the jury instructions as a connected whole, that the trial court did not err in refusing Dr. McCurdy's proposed instruction because the issue was sufficiently and substantially included in the instructions given. *See Richardson*, 76 Hawai'i at 504, 880 P.2d at 179 (citing *State v. Pioneer Mill Co.*, 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981)) (citation omitted).

### E. *Alleged Golden Rule And Personal Opinion Violations*

■ Finally, Dr. McCurdy claims that Ditto violated the "Golden Rule" by asking jurors to place themselves in Ditto's shoes, and that Ditto improperly gave the jury a personal opinion about the credibility of the witnesses. The Golden Rule argument is where "jurors are urged to place themselves or members of their families or friends in [the] place of [a] person who has been offended and to render [the] verdict as if they or either of them or [a] member of their families or friends were similarly situated...." *Black's Law Dictionary* 623 (5th ed.1979) (citation omitted). This is considered improper in both civil and criminal cases.

■ Personal opinions about evidence or witness credibility are likewise improper. Hawai'i Code of Professional Responsibility DR 7–106(C)(4) provides in part: "a lawyer shall not assert his [or her] personal opinion as to the credibility of a witness...."

■ Ditto points out, however, that Dr. McCurdy "never objected during Ms. Ditto's closing argument. Thus he has waived all objections." Ditto is correct. "It is well settled that objections not raised or properly preserved at trial will not be considered on appeal." *Craft*, 78 Hawai'i at 294, 893 P.2d at 145 (citing *MPM Hawaiian, Inc. v. Amigos, Inc.*, 63 Haw. 485, 630 P.2d 1075 (1981)). An appellant must, under the provisions of the HRAP, designate "where in the record the alleged error occurred and when it was objected to," HRAP 28(b)(4), and provide "a quotation of the grounds urged at the trial for the objection and full substance of the evidence admitted or rejected." *Id.* at 28(b)(4)(A).

Consequently, we do not reach the merits of either contention, as Dr. McCurdy did not preserve the alleged errors for appeal.

### III. *CONCLUSION*

Accordingly, we (1) affirm that portion of the August 9, 1993 amended judgment that awarded special, general, and punitive damages for negligence; (2) reverse that portion of the amended judgment that awarded prejudgment interest damages on punitive damages;(3) vacate that portion of the amended judgment that awarded fraud damages; (4) vacate the November 6, 1992 order denying Dr. McCurdy's motion for new trial; (5) remand with instructions to issue an order granting in part Dr. McCurdy's July 17, 1992 motion for new trial on the issue of fraud; (6) vacate the September 1 and September 17, 1992 order and supplemental order granting prejudgment interest and remand for a hearing to determine when Ditto's motion for prejudgment interest was served on Dr. McCurdy; (7) in the event the motion was timely, the trial court may award prejudgment interest on special and general damages (but not punitive damages) at the statutorily prescribed rate of ten percent and determine whether Ditto should be awarded prejudgment interest on fraud damages, if any are awarded in favor of Ditto; and (8) in the event the motion was untimely, reverse the granting of the prejudgment interest award in toto.

WATANABE, Justice, dissenting.

I respectfully dissent from the majority opinion in the following respects:

(1) Assuming that the motion for prejudgment interest of Plaintiff–Appellee Janie Ditto (Ditto) was timely served, I disagree that Hawai'i Revised Statutes (HRS) § 636–16 (1993) authorized the trial judge to award Ditto prejudgment interest from October 23, 1986, the date of Ditto's initial consultation with Defendant–Appellant Dr. John A. McCurdy, Jr. (Dr. McCurdy). The plain language of HRS § 636–16 requires that in tort cases, the earliest commencement date that can be designated in awarding interest is "the date when the injury first occurred." In the case of Ditto, I believe her actual injury occurred on November 3, 1986, the date she underwent the first surgery, and not on October 23, 1986 when she merely met with Dr. McCurdy to discuss the surgery.

(2) In light of *Craft v. Peebles*, 78 Hawai'i 287, 893 P.2d 138 (1995), I believe that the trial court committed prejudicial error when it refused to instruct the jury that the standard of care required of Dr. McCurdy had to be determined from expert medical testimony. In *Craft*, the supreme court stated:

> It is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony. The standard of care to which a doctor has failed to adhere must be established by expert testimony because "a jury generally lacks the 'requisite special knowledge, technical training and background to be able to determine the applicable standard without the assistance of an expert.'"

There are, however, exceptions to the rule.

The "common knowledge" exception, which is similar to the doctrine of *res ipsa loquitur*, provides that certain medical situations present routine or non-complex matters wherein a lay person is capable of supplanting the applicable standard of care from his or her "common knowledge" or ordinary experience.

> There are "some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized, the thing speaks for itself without the aid of any expert's advice."

When the "common knowledge" exception is applied, the medical malpractice case transforms into an ordinary negligence case, thus obviating the necessity of expert testimony to establish the applicable standard of care. This exception, however, is rare in application.

*Id.* at 298, 893 P.2d at 149 (emphasis added, citations omitted).

Thus, the law in this jurisdiction except in those rare situations which the majority concedes are not present in this case, is that the standard of care in medical malpractice cases can only be determined from expert medical testimony.

> Expert testimony is important because the focus of the proof ... is on particular professional standards. Such standards may be much more detailed and more difficult to understand than the duties typically imposed on lay defendants. Moreover, without expert testimony, the jury might not understand that a physician is neither an insurer nor a warrantor of the results of the treatment. Thus, proof of an unfavorable result, standing alone, does not establish a physician's liability. Physicians cannot be held liable for mistakes in judgment if pursuing methods regarded as acceptable by their profession.

1 D.W. Louisell, E. Josselyn, & H. Williams, *Medical Malpractice* ¶ 8.04[3][a] at 8–53—8–54 (1996). Even the majority acknowledges that "in the vast majority of jurisdictions including our own, ... expert testimony is generally a necessity to establish the standard of care and medical negligence." Majority Opinion at 121–22, 947 P.2d at 987–988.

The majority also acknowledges that "the trial court's refusal of a relevant instruction that correctly states the law will render the instructions as a whole prejudicially insufficient if the principle is not adequately and fully covered by other instructions." Majority Opinion at 116, 947 P.2d at 984 (citing *Agee v. Kahului Trucking & Storage, Inc.*, 67 Haw. 365, 369, 688 P.2d 256, 259 (1984)). The majority further concedes that, in the instant case, the jury instruction requested by Dr. McCurdy was a correct statement of the principle of law that the standard of care had to be determined from expert medical testimony.[1] Majority Opinion at 121–22, 947 P.2d at 988. Nevertheless, the majority concludes that "Dr. McCurdy's requested instruction was superfluous," although nowhere in its opinion does the majority find that this particular principle or point of law is covered by other instructions.

The majority's conclusion that the lower court correctly denied Dr. McCurdy's requested instruction is based on (1) the failure of Dr. McCurdy to include an instruction on the burden of proving the standard of care, and (2) its view that "instructions three, seventeen, twenty-two, and twenty-seven, when considered as a whole, *adequately embodied the soul* of Dr. McCurdy's requested instruction[.]" Majority opinion at 126–27, 947 P.2d at 994 (emphasis added). However, the majority's own description of these instructions demonstrates the inadequacy of the instructions given.

1. Although conceding that the refused instruction of Defendant–Appellant Dr. John A. McCurdy, Jr. (Dr. McCurdy) is an accurate statement of the law, the majority states that the instruction is confusing, potentially misleading, and poorly drafted because (1) the "first section explains that the standard of care must be determined 'only from the opinions of the physicians,'" implying that the jury can rely on the opinions of physicians not qualified as experts to determine the standard of care; and (2) "[t]he second section states that the standard must also be determined by 'Defendants who have testified as expert witnesses as to such standard[,]'" thus implying "that only those defendant witnesses who have testified as experts should be relied on, juxtaposed to the plaintiff physicians who may not necessarily be experts." Majority Opinion at 121–22, 947 P.2d at 990.

The first sentence of Dr. McCurdy's requested instruction reads as follows:

First, the four instructions cited by the majority clearly did not inform the jury about the principle of law espoused in the requested instruction. Instead, the four instructions informed the jurors that (1) they should consider only the evidence presented at trial in arriving at a verdict; however, they were not required to set aside their own observations and experiences in the affairs of life and could consider the evidence in the light of common sense (instruction number three); (2) they should consider the testimony of experts "like any other testimony" and expert testimony "is to be tried by the same tests, and should receive such weight and credit as the jury deems it is entitled to, when viewed in connection with all other facts and circumstances" (instruction number seventeen); (3) negligence constitutes a failure to possess and exercise the skill, care, and knowledge commonly possessed and exercised by members of the profession (instruction number twenty-two); and (4) the plaintiff held the burden of proving that defendants were negligent and that their negligence was the legal cause of the plaintiff's injuries or damage (instruction number twenty-seven). None of these four instructions presented the law that the standard of care can only be established by expert medical testimony.

Not only did these four instructions fail to even address the law in question, the general instruction in instructions number three and seventeen establish why it was necessary to

> You must determine the standard of professional learning, skill, and care required of the defendants only from the opinions of the physicians, including the Defendants who have testified as expert witnesses as to such standard.
>
> I believe that the addition of a single comma to the written instruction would have clarified the confusion:
>
> You must determine the standard of professional learning, skill, and care required of the defendants only from the opinions of the physicians, including the Defendants, who have testified as expert witnesses as to such standard. (Emphasis added.) Moreover, I am confident that the trial judge would have read the instruction to the jury with the proper intonation and inflection to properly communicate the statement of law that the standard of care required had to be determined only from the opinions of the physicians who had testified as expert witnesses as to such standard.

clearly instruct the jury that the determination of the standard of care must be based only on the testimony of expert medical witnesses. In instruction number three, the jury was told that it could consider the evidence "in the light of [its own] common sense ... [and] in the light of [its own] experience." The jury was also told in instruction number seventeen, that the "testimony of experts is to be considered like any other evidence and ... should receive whatever weight and credit [the jury thinks] it is entitled to, ... [and that] [t]he weight and value to be given to expert testimony, *if at all,* are for you, the jury to decide." (Emphasis added).

Because the jury was specifically told that expert testimony was like any other evidence and could be disregarded if the jury did not believe that such evidence was entitled to any weight and credit, it is quite possible that the jury did indeed disregard the expert testimony, wholly or in part, and relied on its own judgment or other evidence as the standard of care. Dr. McCurdy was therefore clearly prejudiced by the trial court's refusal to give his requested instruction on the standard of care. *See McGraw v. Kerr,* 23 Colo.App. 163, 128 P. 870, 874 (1912) (trial court erred when it refused to instruct jury that in determining whether doctor had exercised ordinary care and skill, it could not set up a standard of its own, but must be guided solely by testimony of physicians; and if jury could not determine from such evidence what constituted ordinary care and skills under circumstances of this case, then there was failure of proof and jury could not find for plaintiff); *Promen v. Ward,* 70 Ohio App.3d 560, 591 N.E.2d 813, 817 (1990) (it is the trial court's duty to include in its charge to the jury a plain, distinct, and unambiguous statement of the law applicable to the case at hand, and where jury was given a standard negligence instruction but not an instruction on the applicable standard of care applicable to a medical malpractice case, jury could have been misled to plaintiff's prejudice).

(3) The majority has remanded the fraud count against Dr. McCurdy for a new trial and has therefore declined to address Dr. McCurdy's contention that the trial court's jury instruction as to fraud was improper. I have serious reservations, however, as to whether, as a matter of law, Dr. McCurdy can be held liable for fraud.

Ditto's first amended complaint alleged that Dr. McCurdy had committed fraud and misrepresentation by (1) holding himself out to Ditto as a plastic surgeon when he was not a plastic surgeon but an ear, nose, and throat specialist; and (2) permitting Karla Scarpiova (Karla) to engage in the practice of nursing when she was not a nurse and not licensed to practice nursing in the State of Hawai'i.

Since there was no evidence adduced at trial that Karla or Dr. McCurdy had ever represented that Karla was a nurse, Karla filed post-judgment motions seeking to vacate the judgment against her for fraud. The trial court ultimately agreed with Karla and entered an order vacating the judgment against her for fraud. Since Karla was determined not to be liable for fraud, I don't see how Dr. McCurdy could be liable for fraud based on Karla's conduct. Therefore, the only fraud allegation against Dr. McCurdy related to his failure to disclose that he was *not* a plastic surgeon, i.e., Dr. McCurdy's silence as to his qualifications.[2]

2. The majority states, in footnote 17 of the opinion, that because Plaintiff–Appellee Janie Ditto (Ditto) "argued" that Dr. McCurdy committed fraud by both the failure to disclose that he was not a plastic surgeon and that he allegedly did not have hospital privileges, on remand, "the jury will decide, based on the evidence presented at trial, whether board certification, medical specialties, hospital privileges, or any other issue were material facts based on the facts and circumstances of Dr. McCurdy's relationship with Ditto." I have serious reservations as to whether Ditto should be allowed to present evidence of the hospital privileges or any other issue not pleaded by Ditto in her complaint for relief.

Hawai'i Rules of Civil Procedure Rule 9(b) requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." The Hawai'i Supreme Court has said that the foregoing rule
is designed, in part, to insure the particularized information necessary for a defendant to prepare an effective defense to a claim which embraces a wide variety of potential conduct. Thus, under Rule 9(b) general allegations of "fraud" are insufficient because they serve little or no informative function[;] rather, a plain-

The Hawai'i Supreme Court has stated that the elements of fraud include:

1) false *representations* made by the defendant; 2) with knowledge of their falsity (or without knowledge of their truth or falsity); 3) in contemplation of plaintiff's reliance upon them; and 4) plaintiff's detrimental reliance.

*Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 30, 837 P.2d 1273, 1288 (1992) (emphasis added).

As a general rule, however, silence about a particular matter is not a representation and does not constitute fraud unless there is a legal duty to disclose that matter:

The law distinguishes between passive concealment and active concealment, or in other words, between mere silence and the suppression or concealment of a fact, the difference consisting in the fact that concealment implies a purpose or design, while the simple failure to disclose a fact does not. Mere silence is not representation, and a mere failure to volunteer information does not constitute fraud. Thus, as a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence or a mere failure to disclose known facts. Where there is no obligation to speak, silence cannot be termed "suppression," and therefore is not a fraud. Either party may, therefore, be innocently silent as to matters upon which each may openly exercise his judgment.

Silence, in order to be actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances.... Concealment or nondisclosure becomes fraudulent only when there is an existing fact or condition, as distinguished from mere opinion, which

the party charged is under a duty to disclose.

37 Am.Jur.2d *Fraud and Deceit* § 145 (1968).

The evidence at trial revealed that while Dr. McCurdy was certified by the American Board of Otolaryngology in 1976, became a Fellow of the American College of Surgeons in 1977, received his board certification as a cosmetic surgeon with the American Board of Cosmetic Surgeons in 1986, and had performed over 150 breast augmentation surgeries by 1986, he was not certified by the American Board of Plastic and Reconstructive Surgeons at the time he performed the surgeries on Ditto. The evidence also indicated that cosmetic surgeons and plastic and reconstructive surgeons performed similar medical treatments and surgeries and that nationwide, a turf battle has been escalating between cosmetic surgeons and plastic and reconstructive surgeons as to which specialty could perform what surgeries. Finally, the evidence showed that in Hawai'i, doctors are licensed to practice medicine without regard to any specialty. Since a physician can choose the specialty that he or she wishes to limit his or her practice to, then any licensed physician in Hawai'i can specialize in plastic surgery. The dispositive issue then is whether Dr. McCurdy, who was certified as, and held himself out to be, an otolaryngologist, surgeon, and cosmetic surgeon, had a duty to inform Ditto that he was *not certified* as a plastic surgeon. This is a question of law, *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 366, 833 P.2d 70, 74 (1992), and I am not convinced that such a duty exists. Therefore, I question whether it is appropriate to remand the fraud issue for a new trial.

tiff must state the circumstances constituting fraud ... with particularity (e.g., allege who made the false representations) and specify the representations made.

*Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 30–31, 837 P.2d 1273, 1288 (1992) (citations omitted).

The only particularized statements of fraud alleged in Ditto's complaint related to Dr. McCurdy's holding himself out as a plastic surgeon and his permitting Karla Scarpiova to engage in the unlicensed practice of nursing. I therefore question whether Ditto has sufficiently pleaded fraud as to the hospital privilege issue.